# PAESANO | AKKASHIAN

ATTORNEYS & COUNSELORS

132 North Old Woodward Avenue
Birmingham, Michigan 48009
P 248.792.6886
F 248.792.6885
www.paesanoakkashian.com

Anthony R. Paesano
Brian M. Akkashian
Richard M. Apkarian Jr.

Daniel S. Hoops
Of Counsel
Also Licensed in Florida

April 10, 2013

**VIA ECF**

Honorable Kiyo A. Matsumoto
United States District Court
Eastern District of New York
c/o Clerk of the Court
Chambers: Room S905
Courtroom: N6G
225 Cadman Plaza East
Brooklyn, New York 11201

RE: *Innovation Ventures, LLC et al. v Walid Jamil et al.*, Docket No: 12 Civ. 05354

Dear Judge Matsumoto:

The undersigned counsel represents Defendants Walid Jamil, Raid Jamil, Justin Shayota, Midwest Wholesale Distributors, Inc., JT Wholesale, Inc. and Trimexico, Inc. (collectively, the "Midwest Defendants") in the referenced case. This letter is being sent pursuant to Rule (IV)(B)(1) of the Court's Chamber Practices for two reasons: (1) to respond to Plaintiffs' request for a pre-motion conference in connection with Plaintiffs' "planned motion for contempt" against Walid Jamil and Raid Jamil; and (2) to request a pre-motion conference in connection with the Midwest Defendants' planned motion to clarify the asset transfer restriction in the Preliminary Injunctions.

## Plaintiffs' Planned Motion for Contempt Should Not Be Considered

The Court should not consider Plaintiffs' planned motion for contempt for several reasons.

First, the playing field is uneven. Not only do Plaintiffs have a team of lawyers, unlimited resources and an apparent goal of spending Defendants into submission, but Plaintiffs are also controlling all of the evidence and refusing to share it with Defendants. As this Court is aware, Plaintiffs, without warning, seized all documentary (and other tangible) evidence in Defendants' possession at the very beginning of the case; they did not merely make photocopies. Since then, Plaintiffs have obtained documents from other Defendants and also from third parties through subpoenas, including MGM Grand Casino and Bank of America. Despite having possession of documents from all of these sources, and despite Defendants' requests for copies, Plaintiffs won't share them with Defendants. (See Exhibit 1, Email communications between counsel for Plaintiffs and counsel for the Midwest Defendants). Instead, they pick and choose what they want Defendants and this Court to see by

attaching certain documents to letters to the Court and threatening motions for contempt. It is unfairly prejudicial for Plaintiffs to file motions that rely on certain documents, but refuse to produce the whole universe of documents to Defendants, thereby handcuffing Defendants and preventing them from defending themselves and fully responding. Thus, until the playing field is leveled and Defendants are provided access to all documents and other evidence that Plaintiffs have in their possession and control, the Court should not consider Plaintiffs' motion.

Second, Walid Jamil did not violate any Court order. According to the MGM records that Plaintiffs attached to their letter, Walid went to the casino on five occasions, cashed in $7,650, gambled, and cashed out $11,850, resulting in a net win of $4,200. Because Walid Jamil clearly did not transfer or convey any assets to MGM (instead, MGM paid Walid Jamil $4,200 in winnings), the Court should not consider any contempt motion against him.

Third, Raid Jamil's Bank of America transactions did not violate any Court order. Plaintiffs allege that *after* the Court entered the TRO on November 27, 2012, Raid Jamil transferred a total of $20,500 from his Bank of America account ($17,000 to MGM on November 29, 2012, and $3,500 to Charter Home Healthcare on December 3, 2012). However, as Defendants previously informed Plaintiffs and this Court, Raid Jamil was not served with the TRO. In fact, he did not acknowledge service of process or agree to any asset transfer restriction until December 11, 2012, when the Preliminary Injunction was entered. Thus, prior to December 11, 2012, Raid Jamil was free to spend his money or transact business in any way he saw fit. As a result, Raid Jamil's alleged Bank of America transactions did not violate any Court order.

Fourth, Plaintiffs' letter provides misleading information to this Court in an apparent attempt to sensationalize the facts. Plaintiffs assert that the MGM records show that Raid Jamil gambled $217,300 at the casino after the TRO was entered (the same TRO that wasn't served), thereby implying that Raid Jamil "transferred or conveyed" $217,300 to MGM. This is false. The $217,300 figure relates to money that was "cashed in," not money that was gambled and lost. In fact, the MGM documents purport to show that Raid "cashed out" varying amounts at the casino, often winning money, like Walid. Thus, the Court should not consider Plaintiffs' planned motion, which apparently will rely on misleading information.

Fifth, Plaintiffs do not have "clear and convincing" evidence that Raid Jamil violated any Court order. In their letter, Plaintiffs cited the Second Circuit's opinion in the *Paramedics Electromedicina* case, which requires clear and convincing evidence of non-compliance with a court order to hold a party in contempt. Here, Plaintiffs have failed to lay any foundation for the MGM documents, failed to establish their authenticity, and failed to obtain any testimony from the records custodian at MGM as to what the documents actually show. Plaintiffs have also failed to establish the source of the money gambled, or how much was actually won or lost, as the documents only provide "EST. W/L," which means estimated win/loss. Thus, Plaintiffs clearly lack "clear and convincing" proof of non-compliance.

Based on the foregoing, as well as the issues raised below, the Court should not consider any motion for contempt against Walid or Raid Jamil. If, however, Plaintiffs such file such a motion, Walid and Raid Jamil should not be forced to file any response brief until they receive access to all documents in Plaintiffs' possession and are able to take additional discovery on the specific issues addressed by Plaintiffs.

### The Midwest Defendants' Planned Motion to Clarify Should Be Considered

The Midwest Defendants respectfully request a pre-motion conference in connection with the Midwest Defendants' planned motion to clarify the asset transfer restriction in the Court's Preliminary Injunctions.

There are three Preliminary Injunctions issued against the Midwest Defendants, one against Raid Jamil (Exhibit 2), one against Walid Jamil, JT Wholesale, Inc. and Trimexico, Inc. (Exhibit 3), and one against Justin Shayota, Midwest Wholesale Distributors, Inc. and others (Exhibit 4). All three orders include asset transfer restrictions that preclude the Midwest Defendants from "transferring or conveying any assets." The first two orders were stipulated and include carve outs for the payment of "reasonable living expenses." The third order, as to Justin Shayota and Midwest Wholesale, does not contain any carve outs.

The purpose of the asset transfer restriction is two-fold: (1) to prevent the Midwest Defendants from transferring any alleged *profits*, or other alleged ill-gotten gains, from the alleged sale of counterfeit 5 Hour Energy; and (2) to prevent the transfer of personal or company assets for little or no consideration to avoid collection.[1] The Midwest Defendants have not transferred any alleged profits from the alleged sale of counterfeit 5 Hour Energy, nor have they fraudulently transferred any company or personal assets to avoid collection, and Plaintiffs do not allege otherwise. However, the Midwest Defendants, particularly the individual Defendants, Walid Jamil, Raid Jamil, and Justin Shayota, have the right to live their lives and conduct their other businesses. They are merely Defendants, not Judgment-debtors. Plaintiffs have asserted a variety of allegations against them, but have proven nothing. Therefore, to restrict the individual Defendants from spending any of their money or income from sources unrelated to 5 Hour Energy is unreasonable. They should not be financially paralyzed or subjected to virtual house arrest throughout these proceedings, which, when including the possibility of appeals, could take years.

Based on the foregoing, the Midwest Defendants request that the Court clarify the actual day-to-day implications of the Preliminary Injunctions. Plaintiffs seem to interpret the Preliminary Injunctions to mean that the Midwest Defendants cannot spend any money, on anything, for any reason. This is clearly unreasonable. Are the Midwest Defendants not allowed to purchase goods or services? Does the exception for "reasonable living expenses" only permit the Jamils to buy groceries, pay their mortgage, and pay their utility bills? Is Justin Shayota not even allowed to pay these expenses? Are none of them allowed to go to the movies, go on vacation, invest in their child's college account, or lease a new car? Because the interpretation advanced by Plaintiffs is unreasonable, the Midwest Defendants seek clarification of the Preliminary Injunctions to fulfill its intended purpose.

Accordingly, the Midwest Defendants request that the Court schedule a pre-motion conference in connection with the Midwest Defendants' motion to clarify the asset transfer restriction in the Court's Preliminary Injunctions. The Midwest Defendants propose that their motion and brief are filed by May 1, 2013, Plaintiffs' response is filed by May 15, 2013, and the Midwest Defendants' reply is filed by May 22, 2013.

Very truly yours,

PAESANO AKKASHIAN, P.C.

Richard M. Apkarian Jr.

cc: Geoffrey Potter

---

[1] See *Motorola, Inc. v. Abeckaser*, 2009 WL 1362833 (2009) ("The Lanham Act authorizes the seizure of counterfeit products, see 15 U.S.C. §1116, but does not specifically authorize the restraint of assets of a defendant in an action arising under the Act. However, because the Lanham Act does give courts the authority to order equitable relief in the form of an accounting of the **seller's profits**, this Court has the authority to order injunctive relief freezing assets in order to ensure availability of final equitable relief.") (emphasis added); McCarthy on Trademarks and Unfair Competition § 30:40 (4th ed.) (Purpose of freezing assets is to preserve "security for plaintiff's future recovery on an accounting of the counterfeiter's **profits**") (emphasis added).