UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
———————————————————————— x
                                            :
INNOVATION VENTURES, LLC, LIVING            :
ESSENTIALS, LLC, and INTERNATIONAL          :
IP HOLDINGS, LLC,                           :   12 Civ. 5354 (KAM) (RLM)
                          Plaintiffs,       :
                                            :
         - against -                        :
                                            :
ULTIMATE ONE DISTRIBUTING CORP.,            :
ET AL.,                                     :
                          Defendants.       :
                                            :
———————————————————————— x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR CONTEMPT SANCTIONS AGAINST DEFENDANTS WALID JAMIL AND RAID JAMIL

Geoffrey Potter
Thomas P. Kurland
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036
Tel: 212-336-2000
Fax: 212-336-2222

*Attorneys for Plaintiffs Innovation Ventures LLC, Living Essentials, LLC, and International IP Holdings, LLC*

6145941v.2

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*A.V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
   279 F. Supp. 2d 341 (S.D.N.Y. 2003)..................................................................................8

*Barney v. Consol. Edison Co. of New York*,
   2012 U.S. Dist. LEXIS 36100 (E.D.N.Y. Mar, 16, 2012).....................................................7

*EEOC v. Local 638, Local 28 of the Sheet Metal Workers' Int'l Ass'n*,
   117 F. Supp. 2d 386 (S.D.N.Y. 2000), *aff'd*, 247 F.2d 333 (2d Cir. 2001)...........................7

*Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse*,
   2010 U.S. Dist. LEXIS 144425 (S.D.N.Y. Aug. 9, 2010).....................................................3

*Huber v. Marine Midland Bank*,
   51 F.3d 5 (2d Cir. 1995)........................................................................................................8

*Leser v. US Bank Nat'l Ass 'n*,
   2011 U.S. Dist. LEXIS 28127 (E.D.N.Y. Mar. 18, 2011)....................................................6

*Louis Vuitton S.A. v. Spencer Handbags Corp.*,
   765 F.2d 966 (2d Cir. 1985)..................................................................................................3

*N.A. Sales Co. v. Chapman Indus. Corp.*,
   736 F.2d 854 (2d Cir. 1984)..................................................................................................7

*Vuitton Fils, S.A. v. Carousel Handbags*,
   592 F.2d 126 (2d Cir. 1979)..................................................................................................7

*WMS Gaming, Inc. v. WPC Prods. Ltd.*,
   542 F.3d 601 (7th Cir. 2008) ................................................................................................3

**STATUTES**

15 U.S.C. § 1117(a) .....................................................................................................................3

Plaintiffs Innovation Ventures, LLC, Living Essentials, LLC, and International IP Holdings, LLC (collectively "Living Essentials") respectfully submit this reply memorandum of law in support of their motion for an Order holding Defendants Walid ("Wally") Jamil and Raid ("Brian") Jamil (together, the "Jamil Defendants") in contempt for violating this Court's Temporary Restraining Orders issued on November 13, and 27, 2013 and its Preliminary Injunction Orders entered on December 11, 2012.

## INTRODUCTION

All of the counterfeit 5-hour ENERGY® that Living Essentials has accounted for—*over four million bottles*—originated with Midwest Wholesale Distributors, a company controlled by Walid Jamil, and managed by Walid's brother Raid Jamil. While the Jamil defendants dispute the extent of their personal involvement in their own company's multi-million-dollar counterfeiting operation, determining their precise individual contributions to Midwest's scheme is for another day. For the purposes of Living Essentials' instant motion for contempt, the facts are clear: Walid and Raid Jamil have been subject to a Court-ordered total asset freeze since November, 2012. Since then, they have both violated these asset freeze orders on multiple occasions (of which Living Essentials is aware), by withdrawing thousands of dollars from a personal checking account and gambling tens of thousands more at a casino. These are facts which the Jamil Defendants do not and cannot deny. The Jamil Defendants are in contempt of this Court's unambiguous orders, and should be sanctioned accordingly.

## ARGUMENT

I. THE JAMIL DEFENDANTS MISREPRESENT THE FACTS CONCERNING THEIR COUNTERFEITING SCHEME

    A. **Walid Jamil did substantially more than "put labels on the bottles," and earned substantially more than $100,000.**

The Jamil Defendants argue that Walid Jamil's role in counterfeiting 5-hour ENERGY® was limited to "put[ting] labels on the bottles." Midwest Defendants' Opposition to Plaintiffs' Motion for Contempt ("Opp. Mem.") at 1. This assertion is flatly contradicted by Walid Jamil's own testimony. In addition to "put[ting] labels on the bottles," Walid Jamil testified that he orchestrated an entire operation to design, manufacture, and import counterfeit labels and packaging from vendors throughout Southern California and Mexico. *See generally*, Declaration of Geoffrey Potter in Support of Plaintiffs' Reply Memorandum in Support of Contempt ("Potter Reply Decl."), Exhibit A (November 27, 2012 Deposition of Walid Jamil) at 25:5-29:10. Further, Walid Jamil testified that he arranged for the creation of the graphics for the counterfeit 5-hour ENERGY® he produced by purchasing a carton of legitimate 5-hour ENERGY® from a store, giving it to Leslie Roman—a "broker" that Walid Jamil located on his own—and instructing Roman to recreate it, without permission from Living Essentials. *See* Potter Reply Decl., Ex. A., at 27:16-29:10; 40:6-41:5. Walid Jamil also testified that, once his supply of Spanish-label 5-hour ENERGY® was exhausted, he purchased additional unlabeled bottles from Roman. *See* Potter Reply Decl., Ex. A., at 40:16-41:5. Finally, in addition to purchasing unlabeled bottles filled with liquid and labeling and packaging them as counterfeit 5-hour ENERGY®, Walid Jamil testified that he was personally involved in the sale of millions of bottles of counterfeit 5-hour ENERGY® to Dan-Dee Company, Inc. *See* Potter Reply Decl., Ex. A., at 97:7-99:7.

Similarly, Walid Jamil's claim that he made "approximately about $100,000" during the counterfeiting scheme, Opp. Mem. at 1, is completely belied by the evidence. Walid Jamil testified that Midwest sold "probably close to 4 million" bottles of counterfeit 5-hour ENERGY®. *See* Potter Reply Decl., Ex. A., at 34:22-35:4. He explained that these bottles sold at an average price of $270.00 per case of 216 bottles ($260/case for orange and berry flavor, $290/case for extra-strength berry flavor). *See* Potter Reply Decl., Ex. A., at 38:6-9. He also explained that while co-Defendant Joe Shayota invested much of the capital to get the counterfeiting operation up and running, Shayota "got his investment back, and then whatever profits we started splitting." Potter Reply Decl., Ex. A., at 37:3-4. Thus, simple arithmetic suggests that Midwest's profits from the operation were in the millions. This fact is supported by the invoices that the Midwest Defendants have already produced, documenting net sales of $5 million. *See* Plaintiffs' Memorandum of Law in Support of Contempt ("Pl. Mem."), Dkt. No. 526 at 16, fn. 2.[1]

---

[1] Walid Jamil's attempt to distinguish between the *revenues* of his scheme and the *profits* of his scheme is unavailing. Under the Lanham Act, Living Essentials need not establish the defendant's net profits. Rather, Living Essentials need only establish the defendant's *gross sales*, and then the burden shifts to the defendants to establish their expenses through admissible, credible evidence. *See* 15 U.S.C. § 1117(a) ("[i]n assessing profits the plaintiff shall be required to prove defendant's sales only," and the "*defendant* must prove all elements of cost or deduction claimed") (emphasis added); *see also WMS Gaming, Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 608 (7th Cir. 2008) ("[T]o obtain an accounting of an infringer's profits . . . [i]t is enough that the plaintiff proves the infringer's sales. The burden then shifts to the defendant, which must prove its expenses and other deductions from gross sales."); *Louis Vuitton S.A. v. Spencer Handbags Corp.*, 765 F.2d 966, 973 (2d Cir. 1985) ("Plaintiffs here proved defendants' sales [of counterfeit products] . . . . The burden then shifted, requiring defendants to prove costs or deductions."). Here, Walid Jamil's conclusory and demonstrably false assertion that he made only "about $100,000" is insufficient, as a matter of law, to rebut Living Essentials' evidence of Midwest's gross sales or to establish Midwest's legitimately deductible expenses. *See Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse*, 2010 U.S. Dist. LEXIS 144425, at *17-18 (S.D.N.Y. Aug. 9, 2010)( "[i]n evaluating an infringer's claimed deductions, the court is to draw all presumptions against the infringing party, particularly if any uncertainty about the validity or amount of a deduction is attributable to the infringer's inadequate record keeping.")

**B. Raid Jamil controlled Midwest's finances throughout the counterfeiting operation, and he had direct involvement in purchasing and approving counterfeit labeling and other counterfeiting supplies.**

Raid Jamil's claim that he "had no involvement with [5-hour ENERGY®] whatsoever," Opp. Mem. at 1, is similarly incredible. Indeed, Raid Jamil's own sworn testimony contradicts this assertion. Raid Jamil testified that he did "whatever [Walid] asked [him] to do," including "do[ing] the wiring" for the majority—if not all—of Midwest's banking transactions during the period that Midwest was producing and selling counterfeit 5-hour ENERGY®. *See* Potter Reply Decl., Exhibit B (February 7, 2013 Deposition of Raid Jamil) at 23:15-24:3; 92:10-93:21; 109:12-20. Raid Jamil testified that during this period, from February through October 2012, he oversaw the transfer of millions of dollars *to* the Midwest account from Baja Exporting and Dan-Dee and its principles Kevin and Fadi Attiq, and *from* the Midwest account to entities such as co-Defendants Baja Exporting, MCR Packaging, One Stop Label, Flexopack, and other entities that supplied Midwest's counterfeiting operation. *See, e.g.,* Potter Reply Decl., Ex. B at 113:16-119:25; 143:12-157:10; 167:15-172:16. In addition to controlling Midwest's bank account, Raid testified that he received—and approved—invoices from co-Defendant One Stop Label for labels for 5-hour ENERGY®. See Potter Reply Decl., Ex. B at 49:19-53:18.

Further, Walid Jamil's testimony suggests that Raid Jamil was closely involved in Midwest's operations. Walid Jamil testified that Raid Jamil was "in charge of the payments" for supplies relating to Midwest's counterfeiting scheme. *See* Potter Reply Decl., Ex. A at 41:23-42:2. Walid Jamil's testimony also corroborates that Raid Jamil was a signatory on Midwest's bank account, and suggests that Raid Jamil "probably" received commission—in cash—for his work with Midwest. *See* Potter Reply Decl., at 42:3-11.

-4-

6145941v.2

For Raid Jamil to now claim that he had "no involvement . . . whatsoever" is ridiculous. Whether he was an equal partner in his brother's counterfeiting scheme or not, Raid Jamil has confessed that he "knew [Walid] was doing something with Five Hour . . . ." Potter Reply Decl., Ex. B at 25:3-4. This, coupled with the fact that Raid Jamil oversaw the finances of Midwest's massive counterfeiting operation—*and handled its millions in profits*, belies his protestations of innocence.

## II. THE JAMIL DEFENDANTS' CLAIM OF "INNOCENT MISUNDERSTANDING" IS FLATLY UNBELIEVABLE

### A. The Jamil Defendants' affidavits suggest they willfully violated the asset freeze orders.

In their opposition memorandum, the Jamil Defendants claim that they "always interpreted the asset freeze provisions as prohibiting the transfer of revenue or profits from 5 Hour Energy business, to the extent any existed, and also prohibiting the *fraudulent* transfer of personal assets to avoid potential collection." Opp. Mem. at 4 (citing Opp. Ex. 2, Supporting Declaration of Walid Jamil ¶ 4; Opp. Ex. 3, Supporting Declaration of Raid Jamil ¶ 4) (emphasis in original). Of course, as discussed below and in Living Essentials' opening memorandum, the Jamil Defendants' *counsel* did not "always" interpret the asset freeze provisions that way. The Jamil Defendants' supporting declarations, however, essentially state that they adopted their self-serving interpretations *in willful disregard of the advice of their counsel*: both Jamil defendants declare that "regardless of . . . what [their] *attorneys advised*," they interpreted this Court's asset freeze as limited to funds literally earned from their counterfeiting scheme. *See* Opp. Ex. 2 at ¶4; Opp. Ex. 3 at ¶4 (emphasis added).

If the Jamil Defendants' attorneys counseled them that the asset freeze order was to be interpreted in a certain way, and the Jamil defendants blatantly disregarded this advice, as they now suggest, they cannot claim in the same breath that this misinterpretation was

-5-

6145941v.2

"innocent." Moreover, it defies belief that, in the very same paragraphs where they attribute their "misunderstanding" to their status as laypersons (and their disregard of their attorney's advice), they attempt to justify their contemporaneous interpretation as supported by *case law interpreting the Lanham Act*. *See* Opp. Mem. at 4; Opp. Ex. 2 ¶ 4; Opp. Ex. 3 ¶ 4. As such, a finding of willfulness is required. *See generally Leser v. US Bank Nat'l Ass'n*, 2011 U.S. Dist. LEXIS 28127 at *42 (E.D.N.Y. Mar. 18, 2011).

### B. The Jamil Defendants' conduct leading up to the imposition of the December 11, 2012 Preliminary Injunctions strongly suggests they understood the scope of the freeze.

Similarly, the Jamil Defendants' claim that their "innocent misinterpretation" of the asset freeze provisions was "understandable" because they "did not realize" that a total asset freeze would "prohibit[] [them] from spending any money whatsoever, including income completely unrelated to 5 Hour Energy" is contradicted by their course of dealing with Living Essentials and with the Court. *See* Opp. Mem. at 4; Opp. Ex. 2 ¶ 5; Opp. Ex. 3 ¶ 5. As early as December 7, 2013, counsel for Walid Jamil expressed concern that a *total* asset freeze would have the effect of financially paralyzing his client. *See* Pl. Mem. at 6. This concern ultimately resulted in this Court ordering the Jamil Defendants to submit evidence in support of their request for "reasonable living expenses" on December 10, 2012. *See* Pl. Mem. at 6-7; *see also* Unnumbered Minute Order Dated December 10, 2012. In response, Walid Jamil submitted an unsubstantiated request for $10,000 a month, excluding legal fees. *See* Dkt. No. 250.

It makes absolutely no sense that Walid Jamil would submit this request for monthly living expenses if he believed at that time—as he now asserts he believed—that the asset freeze order was literally limited to funds he earned from counterfeiting. And although Raid Jamil never availed himself of the opportunity the Court afforded him to submit a request for reasonable living expenses, considering that the same counsel contemporaneously negotiated

-6-

6145941v.2

both asset freeze orders, Raid's claim to have contemporaneously "misunderstood" the Court's order is no more plausible than his brother's.[2]

### III. LEGAL AUTHORITY EXISTS FOR THE RELIEF THAT LIVING ESSENTIALS REQUESTS

The Jamil Defendants' contention that no authority exists for the relief that Living Essentials is seeking is entirely without merit. *See* Opp. Mem. at 5.

First, as noted in Living Essentials' initial moving papers, district courts have broad-reaching discretion to craft remedies for blatant contempt of their orders. *See* Pl. Mem. at 14; *see also N.A. Sales Co. v. Chapman Indus. Corp.*, 736 F.2d 854, 857 (2d Cir. 1984); *Vuitton Fils, S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir. 1979); *Barney v. Consol. Edison Co. of New York*, 2012 U.S. Dist. LEXIS 36100 (E.D.N.Y. Mar, 16, 2012).

Second, ordering a contemnor to place funds in escrow is well within a court's inherent equitable powers. *See, e.g., EEOC v. Local 638, Local 28 of the Sheet Metal Workers' Int'l Ass'n*, 117 F. Supp. 2d 386, 394 (S.D.N.Y. 2000) (creation of escrow fund as contempt sanction "is within the court's equitable powers,"), *aff'd*, 247 F.2d 333, 226 (2d Cir. 2001) ("[W]e reject the Union's contention that the escrow order was otherwise inappropriate. In a

---

2 It bears mention that the Jamil Defendants—for the first time since the Preliminary Injunctions were entered on December 11, 2012—now finally seek a "modification" of the Preliminary Injunctions to create a carve-out for reasonable living expenses. *See* Opp. Mem. at 6-7. In support, they offer the Court "evidence" in the form of itemized lists of expenses. *See* Opp. Mem. at 7; Opp. Ex. 2 at ¶ 9; Opp. Ex. 3 at ¶ 9. The Jamil Defendants' claims are entirely unsubstantiated, and do not meet the requirements of the Court's prior Order directing Walid Jamil to submit "submit documentary materials in support of his request for living expenses . . . includ[ing], but not necessarily limited to, proof of rent or mortgage obligations, vehicle or travel expenses, and other specific personal and family financial Obligations." Unnumbered Minute Order Dated December 10, 2012. As such, unless and until the Jamil Defendants submit credible documentary evidence of their reasonable living expenses, their request for modification should be summarily denied.

6145941v.2

civil contempt proceeding, the district court 'has broad discretion to fashion an appropriate coercive remedy . . .'").

Third, a contemnor bears the burden of producing evidence of his inability to comply with a contempt order. *See Huber v. Marine Midland Bank,* 51 F.3d 5, 10 (2d Cir. 1995). As such, because the Jamil Defendants argue that they are unable to place any funds in escrow (Opp. Mem. at 2), that they have spent any profits they made from their counterfeiting scheme (Opp. Ex. 2 at ¶ 4), and that they are financially paralyzed by the asset freeze orders this Court has imposed (Opp. Mem. at 4), ordering an accounting of the Jamil Defendants' incomes and expenditures from December 2012 to the present is within this Court's authority, and an appropriate step toward formulating an appropriate response. *See e.g., A.V. by Versace, Inc. v. Gianni Versace, S.p.A.,* 279 F. Supp. 2d 341, 355 (S.D.N.Y. 2003) (ordering contemnor to "submit a full and complete picture of his finances and the finances of the entities he controls" to ensure compliance with contempt order). Here, an accounting would serve the dual purpose of (1) establishing the depth and breadth of the Jamils' violations, and (2) aiding the court in crafting the proper remedy.

## CONCLUSION

In light of the foregoing, and for the reasons stated in its initial moving papers, Living Essentials respectfully requests that the Court enter an Order of Contempt that is sufficiently coercive to ensure the Jamil Defendants finally comply with the Court's orders going forward, and that adequately compensates Living Essentials for the harms it has been made to endure. In addition, because the Jamil Defendants' contempt was willful, Living Essentials respectfully requests that the Court award its attorneys' fees and costs for bringing the instant motion.

Dated:    New York, New York
April 30, 2013

Respectfully submitted,

PATTERSON BELKNAP WEBB & TYLER LLP

By: */s/ Geoffrey Potter*
    Geoffrey Potter
    Thomas P. Kurland
1133 Avenue of the Americas
New York, NY 10036-6710
Telephone: (212) 336-2000
Fax: (212) 336-2222
gpotter@pbwt.com
tkurland@pbwt.com
*Attorneys for Plaintiffs Innovation Ventures, LLC, Living Essentials, LLP, and International IP Holdings, LLC*

6145941v.2