UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------X
INNOVATION VENTURES, *et al.*,

               Plaintiffs,        **MEMORANDUM AND ORDER**

    -against-                  12-CV-5354 (KAM)(RLM)

ULTIMATE ONE DIST. CORP., *et al.*,

               Defendants.
----------------------------------X

**MATSUMOTO, United States District Judge:**

## BACKGROUND

On April 19, 2013, plaintiffs Innovation Ventures, *et al.* ("Plaintiffs") filed a motion for contempt against defendants Raid and Walid Jamil (collectively, the "Jamil Defendants" or "Defendants") for Defendants' failure to comply with the terms of temporary restraining orders entered by the court on November 13th and 27th, 2012, and stipulated preliminary injunctions entered by the court on December 11, 2012. (*See* ECF No. 525, Mot. for Contempt at 1.) Plaintiffs specifically argued that the Jamil Defendants violated the court's stipulated preliminary injunctions enjoining Defendants from secreting, transferring, or conveying any assets by gambling away tens of thousands of dollars at Detroit-area

1

casinos, and by otherwise expending assets.[1] (*See* ECF No. 526, Mem. in Supp. of Mot. for Contempt at 2-4.) On April 26, 2013, the Jamil Defendants filed a response in opposition to Plaintiffs' motion for contempt, in which Defendants argued (1) that they "misunderstood the scope of the asset freeze," and (2) that the court should not grant the specific relief sought by Plaintiffs. (ECF No. 537, Response in Opp. at 2.)

On May 7, 2013, the court held oral argument on Plaintiffs' motion for contempt, at which the Jamil Defendants admitted to having spent upwards of $224,000 at several Detroit-area casinos between December of 2012 and April of 2013. (*See* Minute Entry for Motion Hearing/Oral Argument of May 8, 2013.) The court granted Plaintiffs' motion for contempt on the record, and ordered that the Jamil Defendants:

> [D]eposit into an interest-bearing account in the Clerk's Registry of the United States District Court for the Eastern District of New York $1,000,000 by 5/15/13. In the event that the Jamil Defendants fail to deposit this amount into the Clerk's

---

[1] On December 10, 2012, the court ordered Walid Jamil "to submit documentary materials in support of his request for living expenses in the amount of $10,000 per month. Such materials should include, but are not necessarily limited to, proof of rent or mortgage obligations, vehicle or travel expenses, and other specific personal and family financial obligations." (*See* Order re Living Expenses dated Dec. 10, 2012.) In the court's December 11, 2012, Orders entering Preliminary Injunctions against Walid and Raid Jamil, leave was granted to Defendants to request a monthly allowance for the payment of reasonable living expenses, provided that the Jamil Defendants submitted adequate documentation of their monthly expenses for the court's review. (*See* ECF No. 256, Stip. and Order to Prelim. Injunction ¶ 6; ECF No. 258, Stip. and Order to Prelim. Injunction ¶ 6.) As of the filing of Plaintiffs' motion for contempt, neither of the Jamil Defendants had submitted documentation in support of monthly living allowances.

> Registry by 5/15/13, a per diem fine of $1,500 shall be levied against the Jamil Defendants until the full $1,000,000 has been received and verified by the Clerk's Office. Prior to 5/15/13, the Jamil Defendants are permitted to present to the court, along with plaintiffs' counsel, documentation that supports the Walid Defendants' claim that a lesser amount should be ordered held in escrow.

(*Id.*)

On May 15, 2013, the Jamil Defendants submitted a letter in support of a lesser dollar amount being ordered deposited by them into the court's escrow account. (*See* ECF No. 565, Ltr. to Judge re Contempt Ruling.) The Jamil Defendants' letter included twenty-five exhibits, consisting of bankruptcy filings; mortgages; car loans; bank statements; tax returns; paychecks; business and financial records relating to the Defendants' home healthcare company, Charter Home Healthcare, LLC ("Charter"); declarations; and two itemized requests for monthly living allowances. (*See generally id.* at Exs. 1-25.) In their letter to the court, the Jamil Defendants argue that the above documents illustrate that the court's $1,000,000 escrow order is "purely punitive in nature and unnecessary to ensure compliance" with the court's asset freeze orders. (*Id.* at 3.)

That same day, the court issued the following order:

> Having timely received documentation in support of the Jamil Defendants' claim that

3

> an amount less than $1,000,000 should be ordered held in escrow, the court hereby stays the imposition of a per diem fine of $1,500 pending further order of the court. Plaintiffs are permitted, but not required, to file a response to the Jamil Defendants' submissions no later than Friday, 5/17/13.

(Order re Ltr. to Judge of May 15, 2013). Thereafter, on May 17, 2013, Plaintiffs filed a response to the Jamil Defendants' May 15th submission, in which Plaintiffs attacked the sufficiency of the Jamil Defendants' income and asset documentation, and requested (1) that the court reinstate its May 7, 2013, contempt order; and (2) "appoint an independent third-party, such as a receiver, to take charge of Charter's finances." (ECF No. 567, Ltr. in Response at 3.)

On May 22, 2013, Plaintiffs filed a further letter with the court containing additional evidence of the Jamil Defendants' ongoing violations of the court's asset freeze orders. (ECF No. 570, Ltr. Enclosing Additional Evid.) In this letter, Plaintiffs further detailed with subpoenaed exhibits approximately $195,000 in losses at one casino alone by the Jamil Defendants between January 1, 2013, and May 9, 2013. (*See id.* at 1.) The Jamil Defendants responded to Plaintiffs' May 22nd submission via letter on May 31, 2013, in which Defendants opposed Plaintiffs' request to appoint a receiver over Charter, and renewed their request for the court to modify its preliminary injunctions to allow for monthly living allowances

4

in the amount of $2,760 for Walid Jamil, and $4,150 for Raid Jamil.  (*See* ECF No. 577, Ltr. in Response at 2.)

## DISCUSSION

**A.    The Court's Contempt Order**

Documentation provided by Plaintiffs from several Detroit-area casinos frequented by the Jamil Defendants illustrates that Defendants gambled upwards of $300,700 between December 2012 and May 2013 in direct contravention of the stipulated December 2012 asset freeze orders.  (*See generally* ECF No. 527, Aff./Decl. in Supp. of Mot. for Contempt ("Potter Decl.") Exs. 4, 6-8 (Defendants' MGM Grand Detroit player reports totaling $50,000 in losses);[2] Ltr. Enclosing Additional Evid. Ex. A (Raid Jamil's Greektown Casino Hotel Report Action Journal totaling $55,700 cashed in); *id.* Exs. B-C (Defendants' Motor City Casino Hotel Win/Loss Statements totaling $195,000 in losses).  The Jamil Defendants have not disputed having gambled away several hundred thousand dollars.  (*See generally* Tr. of Oral Argument, Potter Decl. Ex. A; *see also* Ltr. to Judge re Contempt Ruling at 2-3.)

---

[2] Plaintiffs initially asserted that the Jamil Defendants had gambled away more than $200,000 at the MGM Grand Detroit since November 2012; however, Defendants correctly note that the MGM records indicate that although $200,000 was "cashed in" during that period, only approximately $50,000 constitutes losses.  (Ltr. to Judge re Contempt Ruling at 2 n.4.)  Regardless of the fact that the full $200,000 cannot be said to have been "lost" by Defendants, the court is troubled by the Jamil Defendants' willingness to gamble any amount after stipulating to total asset freezes.

5

The Jamil Defendants, however, contend that the court's initial order for Defendants to deposit $1,000,000 into a court escrow account is "excessive and unnecessary to ensure compliance." (Ltr. to Judge re Contempt Ruling at 3.) Further, although Defendants "acknowledge that gambling was a violation of the literal terms of the preliminary injunction," they argue that "Plaintiffs suffered no damages as a result, because the source of the funds was not 5 Hour revenue or profit." (*Id.*) Rather, the Jamil Defendants claim that the funds they gambled with came from legal income and profits from the Jamil family's home-healthcare company, Charter. (*Id.* at 2-3.) According to records provided by Defendants, Charter had a net income of $121,407.97 from December 2012 through March 2013. (*See id.* Exs. 19-20.)

Walid and Raid Jamil's paychecks from Charter suggest that during the period from December 1, 2012, through May 10, 2013, Defendants earned a combined $4,637.29 every two weeks for a total during that period of $55,647.48. (*See id.* Ex. 18 (Defendants' paychecks dated May 10, 2013).)[3] Bank of America account records for a Charter checking account reflect that from December 2012 through March 2013, Raid Jamil, as sole owner of the company, personally withdrew $197,051.95 in cash

---

[3] Raid's biweekly check for $2,362.08 **+** Walid's biweekly check for $2,275.21 **=** $4,637.29 every two weeks **x** 12 pay periods between December 1, 2012, and May 10, 2013 **=** $55,647.48.

6

withdrawals, checks made out to himself, and debit card payments to the Motor City Casino Hotel. (*Id.* Ex. 21.) Thus, documents before the court suggest that the Jamil Defendants collected approximately $252,699.43 from Charter between December 1, 2012, and May 10, 2013.

In their post-hearing submissions to the court, Walid and Raid Jamil failed to comply with the court's directive that they respond to the request for financial documentation and information set forth in Plaintiffs' March 28, 2013, letter. (Ltr. in Response at 1; Potter Decl. Ex. A, Oral Arg. Tr. at 42:1-11, 43:7-23.) Instead, the Jamil Defendants request monthly living allowances of $2,760 and $4,150, respectively. (*Id.* at 1.) The court, like Plaintiffs, has concerns about the sufficiency of the documentation provided by Defendants in support of the Defendants' monthly allowance requests. (*See id.* Exs. 1-8, 24-25 (documentation of Defendants' home mortgages, car loans, property tax assessments, and other bills).) Putting aside the fact that the documents submitted in support of the Jamil Defendants living expenses are in the name of other family members such as spouses and parents, thus suggesting that Walid's and Raid's spouses and parents may contribute to at least some of the Jamil Defendants' monthly household expenses, Defendants' submissions only cloud their financial picture.

7

(*See* Ltr. in Response Exs. G-O (accounts in the name of Awatif Jamil, Walid's wife).)

On the basis of the Defendants' requests, the court can infer that the Jamil Defendants jointly incurred approximately $34,550 in living expenses between December 1, 2012, and May 1, 2013.[4] Coupled with Defendants' uncontested total gambling expenditures for the same period of time in the amount of $300,700, the Walid Defendants spent approximately $335,250 between December 2012 and May 2013. This figure is $82,550.57 more than the $252,699.43 that Defendants document having earned from Charter in income and profits during approximately the same period of time. In short, the court is hard pressed to believe that "Walid and Raid Jamil do not have the assets Plaintiffs believe they have." (Ltr. to Judge re Contempt Ruling at 2.) As Plaintiffs note, Defendants appear "able to come up with substantial sums of money whenever they desire to, even after sustaining substantial gambling losses." (Ltr. Enclosing Additional Evid. at 2.) Indeed, the difference between the Walid Defendants' personal and gambling expenses, and their Charter income/profits from December 2012 to May 2013 alone contradicts the purported completeness of Defendants' financial disclosures.

---

[4] Walid's $2,760 in monthly expenses **+** Raid's $4,150 in monthly expenses **=** $6,910 in expenses per month **x** 5 months between December 1st and May 1st **=** $34,550.

Furthermore, at his November 27, 2012, deposition taken pursuant to the court's expedited discovery order, Walid Jamil testified that the underlying counterfeit 5-Hour Energy scheme netted him profits of "[a]pproximately about $100,000, but I'm owed a lot of money from the operation." (ECF No. 155, Reply in Supp. (Decl. of Geoffrey Potter) Ex. 1, Dep. of Walid Jamil at 37:15-16; *id.* at 214:23-215:9; *see also* Response in Opp. at 2-3.) Nowhere in their various submissions to the court do the Jamil Defendants account for the location of these, or any other, profits from the counterfeit scheme. *See Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.*, 369 F.3d 645, 658 (2d Cir. 2004) ("A contemnor may be excused from the burden of a civil contempt sanction if it lacks the financial capacity to comply; but the contemnor bears the burden of production in raising such a defense."); *Huber v. Marine Midland Bank*, 51 F.3d 5, 10 (2d Cir. 1995) ("The alleged contemnor bears the burden of producing evidence of his inability to comply. . . . If he offers no evidence as to his inability to comply . . . or stands mute, he has not met his burden.") (internal quotation marks and citations omitted); *see also Close-Up Int'l, Inc. v. Berov*, 474 Fed. App'x 790, 795 (2d Cir. 2012) (citing *Huber*). Thus, the court finds that the Jamil Defendants have failed to satisfy their burden of showing that

they lack the financial capacity to deposit funds into the Clerk's Registry as ordered on May 7, 2013, and modified below.

Upon careful review of the parties' respective arguments and submissions, the court hereby reinstates and modifies its May 7, 2013, contempt ruling as follows: the Jamil Defendants are ordered to deposit into an interest-bearing account in the Clerk's Registry of the United States District Court for the Eastern District of New York $400,000 by August 16, 2013. In the event that the Jamil Defendants fail to deposit this amount into the Clerk's Registry by this date, a per diem fine of $300 shall be imposed against the Jamil Defendants jointly and severally until the full $400,000 has been received and verified by the Clerk's Office. *See Weitzman v. Stein*, 98 F.3d 717, 719 (2d Cir. 1996) ("[T]he district judge, sitting in equity, is vested with wide discretion in fashioning a remedy" for civil contempt of court orders).

B. **The Jamil Defendants' Request for Monthly Allowances**

The Jamil Defendants request a modification of the court's preliminary injunction to allow for the payment of reasonable living expenses in the amount of $2,760 per month by Walid Jamil, and $4,150 per month by Raid Jamil. (Ltr. to Judge re Contempt Ruling at 2.) Notwithstanding concerns about the adequacy of Defendant's documentation to substantiate these figures, the court reluctantly accepts the Jamil Defendants'

10

representation that they do not retain old bills or receipts from grocery stores, gas stations, restaurants, etc., notwithstanding the court's prior order that they submit supporting documentation. (Ltr. in Response at 1.) Therefore, the court's December 11, 2012, preliminary injunction is hereby amended to allow for the payment of reasonable living expenses in the amount of $2,760 per month by Walid Jamil, and $4,150 per month by Raid Jamil.

    **C.    Plaintiffs' Request to Appoint a Receiver to Take Charge of Charter's Finances**

In light of the substantial amounts of money that the Jamil Defendants have taken from Charter and gambled away, Plaintiffs request that the court appoint an independent third-party, such as a receiver, to take charge of Charter's finances. (Ltr. in Response at 3.) District Courts are authorized to appoint a receiver where "leaving the property [subject to suit] in the hands of the judgment debtor creates a risk of fraud or insolvency." *Spotnana, Inc. v. Am. Talent Agency, Inc.*, No. 09 Civ. 3698, 2013 U.S. Dist. LEXIS 15208, at *17 (S.D.N.Y. Jan. 22, 2013); *see also Republic of Phillipines v. New York Land Co.*, 852 F.2d 33, 36 (2d Cir. 1988) (affirming district court appointment of "special property advisor" to enforce preliminary injunction).

Charter, however, is not a named party to this action; nor is there evidence to suggest that the Jamil Defendants' profits from the underlying 5-Hour Energy counterfeiting scheme were comingled with Charter accounts. *See N. Face Apparel Corp. v. TC Fashions, Inc.*, No. 05 Civ. 9083, 2006 U.S. Dist. LEXIS 14226, at *10 (S.D.N.Y. Mar. 30, 2006) ("District courts have the 'authority to freeze those assets which could [be] used to satisfy an equitable award of profits.'" (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 987 (11th Cir. 1995))). Although money from Charter has been wired directly to Naftaunited.com, a company alleged to have helped facilitate payments between the defendants involved in the underlying 5-Hour Energy counterfeit scheme, unlike the profits of counterfeit schemes, monies used to facilitate a violation of the Lanham Act may not be subject to an asset freeze. *See Klipsch Group, Inc. v. Big Box Store Ltd.*, No. 12 Civ. 6283, 2012 U.S. Dist. LEXIS 153137, at *15-16 (S.D.N.Y. Oct. 24, 2012) ("[W]hile the Court agrees with Plaintiff that it has the power to freeze assets to preserve a later award of an equitable accounting, such a freeze should be confined in scope to the likely profits of counterfeiting activity,").

Therefore, Plaintiffs' request for the court to appoint a receiver to take charge of Charter's finances is denied without prejudice to renew in the event that Plaintiffs

12

submit evidence that Charter's assets are directly linked to Defendants' profits from the alleged 5-Hour Energy counterfeiting scheme.

## CONCLUSION

For the foregoing reasons, the court reinstates and modifies its May 7, 2013, contempt ruling as follows:

(1) The Jamil Defendants are ordered to deposit into an interest-bearing account in the Clerk's Registry of the United States District Court for the Eastern District of New York $400,000 by August 16, 2013. In the event that the Jamil Defendants fail to deposit this amount into the Clerk's Registry by this date, a per diem fine of $300 shall be imposed against the Jamil Defendants jointly and severally until the full $400,000 has been received and verified by the Clerk's Office. Instructions for depositing funds into the Clerk's Registry by wire transfer are attached to this order.

(2) The court's December 11, 2012, preliminary injunction is amended to allow for the payment of reasonable living expenses in the amount of $2,760 per month by Walid Jamil, and $4,150 per month by Raid Jamil.

(3) Plaintiffs' request for the court to appoint a receiver to take charge of Charter's finances is denied without prejudice.

**SO ORDERED.**

Dated:   August 1, 2013
         Brooklyn, New York

_____/s/_____
Kiyo A. Matsumoto
United States District Judge
Eastern District of New York

13

## Instructions for Accepting Fedwire Deposits

- <u>Electronic funds transfers are receipted directly into the Department of Treasury, are handled by the Federal Reserve Banking System, and are referred to as "Fedwire" payment.</u>

- The Treasury FDS system is a computer-to-computer link between Treasury and the Federal Reserve Bank of New York (FRBNY). This system provides the capability for: (1) automated receipt and processing of funds transfers and (2) computer-assisted generation of funds transfers between Treasury, FRBs, and other banks utilizing Fedwire. Treasury maintains an account at FRBNY. As a result, banks that maintain an account at an FRB may send funds transfers to Treasury over Fedwire for credit to the account of the Treasury at FRBNY. Funds transfers between Treasury and banks that do not maintain an account at an FRB are processed through correspondent banks that do maintain an account at an FRB.

- Credit Gateway is the Financial Management Service for Fedwire. The agency wishing to accept Fedwire, makes an application to Credit Gateway for an account with the Federal Reserve Bank to be set up. Once an account is set up the following instructions should be provided to those making a payment by Fedwire.

- **Instructions for those wishing to make a payment by "Fedwire":**

  **Sender must provide the following information to the originating financial institution:**

  | | |
  |---|---|
  | Receiver: | TREAS NYC |
  | Receiver routing number: | 021030004 |
  | Beneficiary: | D 00004653 USDC EDNY |
  | Originator to Beneficiary info: | Case number, defendants name, amount |

  For deposits in the amounts of $50 million or more the guidelines ask the receiving court to provide the following information to the FMS Cash Forecasting Division

  When providing notification, courts must report the following information:
  • Name and address of the court;
  • Name and telephone number of the point of contact;
  • Agency Location Code;
  • Treasury account title and account symbol number (i.e., 10X6855 for restitution, 10X6047 for registry funds);
  • Description of the transaction;
  • Transaction settlement date;

```
                     Court Attachment A
```

- Amount of the deposit or disbursement;
- Deposit or disbursement mechanism (Fedwire, check, etc.); and
- Name and location of the depositary or payee.

Report cash forecasting information to FMS' Cash Forecasting Division using the following email address, facsimile, and/or telephone number:

E-mail address: Funds.Control@FMS.treas.gov
Fax numbers: 202-874-9984 or 202-874-9945
Telephone number: 202-874-9789
Confirmation of Collection

<u>Confirmation of Collection</u>

As funds transfer messages are received by Treasury, the messages are accumulated at the level of each Agency Location Code (ALC).

The court will verify deposit information for accuracy. Errors must be promptly reported to the Department of Treasury's Financial Analysis Branch. 202-874-6900

Treasury's Transaction Reporting System (TRS). The TRS allows the court to receive immediate notification of incoming FDS deposits via online inquiry.

This method is intended to supplement the Daily Support Listing of FDS Deposits and SF 215C which will be sent to the court through the mail.

The "fedwire" is handled as a check received in that day's mail except the deposit has already occurred. A receipt document in CCAM is created with accomplished date in block number 2 of the SF215C.

The court will receipt all erroneous deposits into their suspense accounts (i.e. 6855XX) and make a request to Credit Gateway for a reversal to be issued and an
SF 5515 debit voucher is recorded.

```
                         Court Attachment A
```