```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------- X
INNOVATION VENTURES, LLC; LIVING
ESSENTIALS, LLC; and INTERNATIONAL
IP HOLDINGS, LLC,                                MEMORANDUM AND ORDER

            Plaintiffs,                          12-CV-5354 (KAM) (RLM)

    -against-

ULTIMATE ONE DISTRIBUTING CORP.,
et al.,

            Defendants.

---------------------------------
INNOVATION VENTURES, LLC; LIVING
ESSENTIALS, LLC; and INTERNATIONAL
IP HOLDINGS, LLC,

            Plaintiffs,

    -against-                                    13-CV-6397 (KAM) (RLM)

PITTSBURG WHOLESALE GROCERS, INC.,
et al.,

            Defendants.

--------------------------------X
```

**MATSUMOTO, United States District Judge:**

Plaintiffs Innovation Ventures, LLC; Living Essentials, LLC; and International IP Holdings, LLC (collectively, "plaintiffs" or "Living Essentials") commenced this action alleging that defendants have been involved in a widespread scheme to manufacture, distribute, and sell counterfeit 5-hour ENERGY drinks bearing plaintiffs' trademarks and copyright. Plaintiffs assert claims pursuant to the Lanham

Act, 15 U.S.C. § 1051 *et seq.,* and Copyright Act, 17 U.S.C. § 106, and pursuant to New York statutory and common law. (*See generally* ECF No. 291, Seventh Amended Complaint ("Seventh Am. Compl.") filed 12/28/12.)

Plaintiffs have settled their claims against most of the more than 70 defendants named in this consolidated action. Presently before the court is plaintiffs' omnibus motion for summary judgment against nine groups of remaining defendants (collectively, "Defendants"). Defendants are comprised of companies alleged to have participated in the counterfeiting scheme and certain owners and/or principals of those companies:

- Midwest Wholesale Distributors, Walid Jamil, Raid Jamil, and Justin Shayota (collectively, "Midwest Defendants");

- Dan-Dee Company, Inc., Kevin Attiq, and Fadi Attiq (collectively, "Dan-Dee Defendants");[1]

- Advanced Nutraceutical Manufacturing LLC, Nutrition Private Label, Inc., and Juan Romero Gutierrez (collectively, "Romero Defendants");

- Baseline Distribution, Inc. and David Flood (collectively, "Baseline Defendants");

- Purity Wholesale Grocers ("Purity");

- Core-Mark International, Inc. ("Core-Mark");

- Food Distributors, Inc. and Scott Tilbrook (collectively, "FDI Defendants");

---

[1] On March 29, 2016, Living Essentials and Dan-Dee informed the court that they have settled Living Essentials' claims against the Dan-Dee Defendants. (ECF No. 885, Consent Motion for Judgment Based on Settlement.)

- Elegant Trading and Ahmed Bhimani (collectively, "Elegant Defendants");

- Valero Retail Holdings, Inc. ("Valero")[2]

Plaintiffs move for summary judgment on their claims for: trademark infringement, false description and false designation of origin, and false advertising pursuant to Sections 32 and 43 of the Lanham Act, 15 U.S.C. §§ 1114, 1125; copyright infringement pursuant to 17 U.S.C. § 106 of the Copyright Act; and unfair competition pursuant to state common law. (*See* ECF No. 864-1, Plaintiffs' Corrected Memorandum of Law in Support of Summary Judgment ("Pls. Mem.").)[3]

With respect to the Midwest Defendants, Romero Defendants, and Core-Mark Defendants, plaintiffs seek enhanced statutory damages for willful infringement under the Lanham Act, enhanced statutory damages for willful infringement under the Copyright Act, punitive damages under state common law, attorneys' fees and costs, and permanent injunctive relief.

---

[2] Valero Retail Holdings, Inc. was sued as Valero but subsequently "spun off from Valero Energy Corporation and is now known as CST Services LLC." (*See* ECF No. 861, Core-Mark International Inc. and Valero Retail Holdings, Inc.'s Memorandum in Opposition to Plaintiff's Motion for Summary Judgment ("Core-Mark Opp.") at 10.)

[3] In support of their motion for summary judgment, plaintiffs submitted the following: ECF No. 864-2, Plaintiff's Rule 56.1 Statement of Undisputed Facts; ECF No. 864-3, Declaration of Geoffrey Potter dated 5/11/2015; ECF No. 864-4, Declaration of Robert Addona dated 10/30/2014; ECF No. 864-5, Declaration of Matthew Dolmage dated 10/31/2014; ECF No. 864-6, Declaration of Josh Lichtman dated 10/28/2014; ECF No. 864-7, Declaration of Teague Ryan dated 10/24/2015; ECF No. 864-12, Declaration of Geoffrey Potter dated 12/19/2014; ECF No. 864-15, Joint Deposition Transcript. The court has considered the foregoing and the submissions in opposition.

With respect to the Baseline Defendants, FDI Defendants, Elegant Defendants, Purity, and Valero, plaintiffs seek actual damages for trademark infringement under the Lanham Act, statutory damages for copyright infringement under the Copyright Act, punitive damages under state common law, attorneys' fees and costs, and permanent injunctive relief. Except for the Romero Defendants, each of the Defendants has filed an opposition to plaintiffs' omnibus summary judgment motion.

Also before the court is a cross motions for summary judgment on plaintiffs' claims filed by individual defendant David Flood (a co-owner of Baseline Distributors, Inc.).[4] For the reasons set forth below, plaintiffs' motion for summary judgment is granted in part and denied in part. David Flood's cross-motion for summary judgment is denied.

## PROCEDURAL BACKGROUND

On October 25, 2012, Living Essentials commenced this action, captioned *Innovation Ventures, et al. v. Ultimate One Distributing Corp., et al.* ("*Ultimate* Action") in this court. In its initial complaint, plaintiffs, the owners of 5-hour ENERGY, alleged that more than twenty defendants had sold

---

[4] In support of his cross-motion for summary judgment (ECF No. 856), David Flood submitted the following: ECF No. 856-2, David Flood's Rule 56.1 Statement of Undisputed Facts ("Flood 56.1"); ECF No. 856-3, Declaration of David Flood dated 10/30/2014; ECF No. 856-4, Declaration of Richard S. Schurin dated 10/30/2014; ECF No. 856-8, David Flood's Response to Living Essentials' Rule 56.1 Statement of Additional Material Facts. The court has considered the foregoing and the submissions in opposition.

counterfeit 5-hour ENERGY in violation of the Lanham Act, 15 U.S.C. §§ 1114 and 1125, the Copyright Act of 1976, 17 U.S.C. § 106, New York state law and common law. (*See* U.A. No. 1, Compl. filed 10/25/12.)

On October 26, 2012, plaintiffs filed the action captioned *Innovation Ventures, et al. v. Pittsburg Wholesale Grocers Inc., et al. (*"*Pittsburg* Action"), in the United States District Court for the Northern District of California. In its initial complaint in the *Pittsburg* Action, plaintiffs alleged substantially the same claims as in the *Ultimate* Action against sixteen defendants based in California. (*See* P.A. No. 1, Compl. filed 10/26/12.)

As plaintiffs traced the counterfeit products up the chain of distribution, the *Ultimate* Action grew to include sixty-nine defendants. (*See* U.A. No. 291, Seventh Am. Compl.) In their Seventh Amended Complaint, plaintiffs alleged that Dan-Dee Company, Inc. ("Dan-Dee"), a defendant in the related *Pittsburg* Action, was the principal nationwide "distribution hub" for counterfeit 5-hour ENERGY. (Seventh Am. Compl. at 5.) A number of defendants in the *Ultimate* Action then impleaded Dan-Dee and its principals as third-party defendants in the *Ultimate* Action. (*See* U.A. Nos. 390, 473, 535, 580.) In turn, the Dan-Dee Defendants impleaded a number of defendants from the *Ultimate* Action as third-party defendants in the *Pittsburg*

Action.  (*See* P.A. No. 162, Am. Third-Party Compl. filed

1/23/12.)[5]

        In April 2013, Capital Sales Company, a defendant in

the *Ultimate* Action and a customer of Dan-Dee, filed suit

against the Dan-Dee Defendants in the Eastern District of

Michigan.  The Eastern District of Michigan transferred venue to

this court, and this court consolidated Capital Sales Company's

suit with the *Ultimate* Action.  (Docket 13-cv-3542, ECF No. 28,

Order to Consolidate Cases dated 7/31/12.)

        On November 12, 2013, plaintiffs moved to transfer

venue in the *Pittsburg* Action from the Northern District of

California to this district, on the grounds that all remaining

parties in the *Pittsburg* Action are also parties to the larger,

first-filed *Ultimate* Action, and the issues remaining to be

tried are a subset of the issues in the *Ultimate* Action.  (P.A.

No. 508, Mot. for Change of Venue filed 11/12/13, at 1.)  No

party opposed the motion, and all parties signed a stipulation

requesting that the *Pittsburg* Action "be transferred to the

Eastern District of New York for consolidation with" the

*Ultimate* Action.  (P.A. No. 509, Stip. filed 11/12/13, at 2.)

---

[5] Specifically, the Dan-Dee Defendants impleaded as third-party defendants the
Midwest Defendants; the Romero Defendants; the "MCR Defendants" (Mario
Ramirex, Camilo Ramirez, MCR Innovations and Packaging, Inc., MCR Printing &
Packaging Corp., and Naftaunited.com); the "Roman Defendants" (Leslie Roman,
Donna Roman, Flexopack); the "Baja Defendants" (Baja Exporting, LLC, Tradeway
International, Inc. d/b/a Baja Exporting, Joseph Shayota, and Adrianna
Shayota).

On November 15, 2013, the Northern District of
California transferred the *Pittsburg* Action to this district.
(P.A. No. 530, Order Granting Mot. to Change Venue dated
11/15/13.)  On March 3, 2014, the court granted a joint request
from plaintiffs and the Dan-Dee Defendants to consolidate the
*Ultimate* Action and the *Pittsburg* Action.  (ECF No. 680.)

## FACTUAL BACKGROUND

The following facts are taken from the parties' Local
Civil Rule 56.1 statements, and have not been specifically or
directly disputed with admissible evidence unless otherwise
indicated.  References to paragraphs of the parties' Rule 56.1
statements include materials cited therein and annexed thereto.[6]
The court has considered whether the parties have proffered
admissible evidence in support of their factual statements and
has viewed the facts in the light most favorable to the
nonmoving parties.  *See Spiegel v. Schulmann*, 604 F.3d 72, 81
(2d Cir. 2010) ("It is well established that, in determining the
appropriateness of a grant of summary judgment, . . . the

---

[6] "Pls. 56.1" refers to plaintiffs' Rule 56.1 Statement.  The following
defendants filed responses to plaintiff's Rule 56.1 Statement:  Midwest
Defendants (ECF No. 878-1; "Midwest 56.1"); Dan-Dee Defendants (ECF No. 873-
1; "Dan-Dee 56.1"); Baseline Defendants (ECF No. 854-2; "Baseline 56.1");
Purity (ECF No. 859-1, 859-2; "Purity 56.1"); Core-Mark (ECF No. 861-2;
"Core-Mark"); FDI Defendants (ECF No. 860-1, 860-2; "FDI 56.1"); Elegant
Defendants (ECF No. 848-3; "Elegant 56.1"); Valero (ECF No. 861-2; "Valero
56.1").  Two sets of defendants filed additional Rule 56.1 statements of
material facts: Dan-Dee Defendants (ECF No. 873-1; "Dan-Dee Add'l 56.1") and
Elegant Defendants (ECF No. 848-3; "Elegant Add'l 56.1").  In response,
plaintiffs filed a reply Rule 56.1 statement (ECF No. 846-14; "Pls. Reply
56.1").

district court in awarding summary judgment, may rely only on admissible evidence." (citations and quotation marks omitted)); *Scotto v. Brady*, 410 Fed. App'x 355, 361 (2d Cir. 2010) ("'[A] district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence,' and '[t]he principles governing admissibility of evidence do not change on a motion for summary judgment.'") (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009)).

## I.   Living Essentials and 5-hour ENERGY

Plaintiffs own, manufacture, and distribute 5-hour ENERGY, which is sold as a liquid dietary supplement in 1.93-ounce bottles in a variety of flavors and strengths.  (Pls. 56.1 ¶ 1.)  Plaintiffs Innovation Ventures, LLC, Living Essentials, LLC, and International IP Holdings, LLC all share common ownership and control of plaintiffs' intellectual property. (Pls. 56.1 ¶ 2.)  Specifically, International IP Holdings, LLC holds title to 5-hour ENERGY trademarks and copyright (and other intellectual property not at issue here).  (Pls. 56.1 ¶¶ 21-22.) Innovation Ventures, LLC is the worldwide exclusive licensee of 5-hour ENERGY trademarks and copyright.  (Pls. 56.1 ¶ 24.) Living Essentials, LLC distributes 5-hour ENERGY.  (Pls. 56.1 ¶ 30.)

Living Essentials has registered and owns five trademarks and one copyright that appear on the packaging of 5-hour ENERGY bottles. The trademarks at issue (the "5-hour ENERGY Marks") are registered on the Principal Register of the U.S. Patent and Trademark Office as follows:

- 4,004,225: The "5-HOUR ENERGY" trademark was registered on August 2, 2011;

- 4,104,670: The "5-HOUR ENERGY" trademark depicting the word "5-HOUR" above the word "ENERGY" was registered on February 28, 2012;

- 4,116,951: The "5-HOUR ENERGY" trademark depicting the words "5-HOUR ENERGY" in black outlined in yellow, below which are the words "EXTRA STRENGTH" along with a person in black silhouette was registered on March 27, 2012;

- 3,698,044: The "Running Man" trademark was registered on October 20, 2009; and

- 4,120,360: The "5-HOUR ENERGY" trademark depicting the words "5-HOUR ENERGY" in black outlined in yellow along with a person in black silhouette was registered on September 17, 2010.

(Pls. 56.1 ¶ 18.)

The copyright at issue (the "5-hour ENERGY Copyright"), Registration No. TX 6-833-514, applies to the "Caution" label on 5-hour ENERGY bottles. (Pls. 56.1 ¶ 19.) The copyrighted material on the label reads as follows:

CAUTION: Contains about as much caffeine as a cup of coffee. Limit caffeine products to avoid nervousness, sleeplessness, and occasionally rapid heartbeat. You may experience a Niacin Flush (hot feeling, skin redness) that lasts a few minutes. This is caused by

> Niacin (Vitamin B3) increasing blood flow near the
> skin.

(Pls. 56.1 ¶ 18.)  The 5-hour ENERGY Copyright, as well as
Trademark Nos. 4,004,225; 4,104,670; and 3,698,044, appear on
every bottle of 5-Hour Energy.  (Pls. 56.1 ¶ 20.)  Trademark No.
4,116,951 appears only on extra-strength bottles of 5-hour
ENERGY.  Trademark No. 4,120,360 appears on only regular-
strength bottles.  (*Id.*)  Neither the validity of the 5-hour
ENERGY Marks and 5-hour ENERGY Copyright nor their ownership by
Living Essentials is disputed by Defendants.

Since 2011, all authentic 5-hour ENERGY has been
manufactured by Living Essentials "under strict quality control"
standards at two factories owned and operated by Living
Essentials in Wabash, Indiana.  (Pls. 56.1 ¶ 5.)  Living
Essentials distributes 5-hour ENERGY in a variety of
configurations, each with a unique "stock keeping unit" ("SKU")
number.  (Pls. 56.1 ¶ 13.)  A typical configuration used for
wholesale and retail distribution is twelve loose bottles
arranged in 4x3 rows in a point-of-sale display box.  (*Id.*)
Eighteen display boxes are packed together into a master case
containing 216 bottles, and forty-two master cases are placed on
a pallet.  (*Id.*)  Living Essentials sells 5-hour ENERGY directly
or through a network of independent brokers across the United
States that sell product on its behalf.  (Pls. 56.1 ¶ 30.)  On
average, more than nine million bottles of 5-hour ENERGY are

sold each week.  (Pls. 56.1 ¶ 3.)  Living Essentials maintains

over a 90% market share of the energy shot market through its

sales of 5-hour ENERGY.  (Pls. 56.1 ¶ 28.)

## II. Manufacture, Distribution, and Sale of Counterfeit 5-Hour Energy

### A. Diversion of Mexican-Label 5-hour ENERGY into the United States

By late 2009, defendants Tradeway International, Inc.

d/b/a Baja Exporting ("Baja"); Joe Shayota (a principal of

Baja); and Adrianna Shayota (a principal and owner of Baja)

(collectively, the "Baja Defendants")[7] had become Living

Essentials' authorized distributor of authentic 5-hour ENERGY in

Mexico.  (Pls. 56.1 ¶ 40.)  Living Essentials developed Spanish-

language labels and packaging for 5-hour ENERGY that were

intended for distribution exclusively in Mexico.  (Pls. 56.1 ¶

41.)  The Baja Defendants were not authorized to sell Spanish-

label 5-hour ENERGY in the United States.  (Pls. 56.1 ¶ 43.)

In January 2010, the Baja Defendants began ordering

hundreds of thousands of bottles of Spanish-label 5-hour ENERGY.

(Pls. 56.1 ¶ 44.)  Living Essentials sold these bottles to Baja

at a discount from the price it charged U.S. distributors for

English-labeled product.  (Pls. 56.1 ¶ 45.)  Baja then attempted

to sell its Spanish-label 5-hour ENERGY in the United States to

---

[7] Living Essentials has settled its claims against the Baja Defendants.

Dan-Dee.  (Pls. 56.1 ¶ 49; JA 1, 10/11/2013 Deposition of Kevin Attiq ("K. Attiq Dep.") Tr. 370:5-20.)  Dan-Dee offered the Spanish-label product to some of its regular U.S. customers but was unable to find a buyer.  (Pls. 56.1 ¶ 49.)

In May 2011, having been unable to sell its Spanish-label 5-hour ENERGY to U.S. distributors, Baja reached an agreement with Walid Jamil, a principal of defendant Midwest Wholesale Distributors, to "swap" the Spanish-language labels and packages with English-language labels and packages.  (Pls. 56.1 ¶ 51; Midwest 56.1 ¶ 51.)  In August 2011, a Midwest affiliate called "Tri Mex" ordered tens of thousands of counterfeit English-language 5-hour ENERGY display boxes from a company called MCR Printing.  (Pls. 56.1 ¶¶ 55-56.)  Walid Jamil at Midwest then contacted a "label broker" named Leslie Roman[8] and ordered 500,000 counterfeit English-language plastic sleeves to shrink-wrap onto the authentic 5-hour ENERGY bottles that had been wrapped in Spanish-language sleeves.  (Pls. 56.1 ¶¶ 58-59; JA 40, 12/3/2012 Deposition of Mario Ramirez Tr. 43:18-45:19.)  Walid's brother, Raid "Brian" Jamil, signed Midwest's first purchase order for the counterfeit labels and completed a fraudulent California Resale Certificate explaining that Midwest was a "wholesaler" purchasing the labels for "resale" purposes.

---

[8] Plaintiffs have settled their claims against Leslie Roman and his affiliated companies, Flexopack and One-Stop Label.  (Pls. Mem. at 12.)

(Pls. 56.1 ¶ 60.)  Roman then worked with a printing company to recreate U.S. 5-hour ENERGY labels.  (Pls. 56.1 ¶ 61.)

In early September 2011, Baja began shipping loads of authentic Mexican-label 5-hour ENERGY to Midwest's warehouse in California.  (Pls. 56.1 ¶ 65.)  Upon delivery, Midwest's Justin Shayota and a team of workers removed the Mexican labels from bottles using a razor blade and wiped away the lot code and expiration date using rags and a solvent.  (Pls. 56.1 ¶ 67-68.) New lot numbers and expiration dates were then applied to the bottles using an industrialized printer.  (Pls. 56.1 ¶ 69.) Workers at the Midwest warehouse, under Justin's direction, would then place English-language counterfeit labels over the bottles and shrink them into place using a steam tunnel.  (Pls. 56.1 ¶ 70.)  Other members of Justin's team assembled the individual bottles inside counterfeit display boxes, which were then packed into counterfeit master case boxes.  (Pls. 56.1 ¶ 71.)  By December 2011, Baja sold the entire inventory of repackaged 5-hour ENERGY – almost 355,000 bottles – to Dan-Dee and other wholesalers.  (Pls. 56.1 ¶ 75.)

**B.   Counterfeit 5-hour ENERGY Bottles, Labels, and Liquid**

Between December 2011 and October 2012, Midwest's Walid Jamil and Justin Shayota ordered more than 7 million additional counterfeit 5-hour ENERGY bottle labels.  (Pls. 56.1 ¶ 76.)  Walid also contacted Leslie Roman to find a manufacturer

13

of bottles and caps.  (Pls. 56.1 ¶ 80; JA 8, 12/10/2012
Deposition of Leslie Roman ("Roman Dep.") Tr. 52:24-53:6.)  In
turn, Roman contacted Juan Romero Gutierrez ("Romero"), a
manufacturer of made-to-order liquid products who did business
as Advanced Nutraceutical Manufacturing, LLC and Nutrition
Private Label, Inc. (Pls. 56.1 ¶ 81.)  Roman gave Romero samples
of authentic 5-hour ENERGY bottles and bottle caps, as well as
an image of Living Essentials' trademarked "Running Man" logo
that appears on authentic bottle caps, to provide to potential
suppliers.  (Pls. 56.1 ¶ 82.)  Roman and Romero traveled to
Mexico and hired two Mexican companies to supply blank bottles
and caps imprinted with the "Running Man" logo.  (Pls. 56.1 ¶
83.)  Romero proceeded to order millions of these bottles and
caps.  (Pls. 56.1 ¶ 84.)  The counterfeit bottles were
problematic because they were slightly wider than the authentic
Mexican-label bottles that the Midwest Defendants had been
relabeling.  (Pls. 56.1 ¶ 86.)  As a result, the Midwest
Defendants had to order new counterfeit labels.  (*Id.*)

   Romero filled the counterfeit bottles with counterfeit
liquid that he personally manufactured.  (Pls. 56.1 ¶ 88; Roman
Dep. Tr. 60:18-61:9; JA 10, 1/22/2013 Deposition of Juan Romero
Gutierrez ("Romero Dep.") Tr. 103:25-104:5.)  Romero purchased
at least some of the ingredients for his mixture (e.g., malic
acid) by the ton (Pls. 56.1 ¶ 91; Romero Dep. Tr. 152:11-18) and

mixed the ingredients together in 200-liter barrels at his warehouse. (Pls. 56.1 ¶ 91; Romero Dep. Tr. 19-20.) The list of ingredients that Romero used for the counterfeit liquid features the same ingredients as those ingredients listed on bottles of authentic 5-hour ENERGY. (Pls. 56.1 ¶ 89.)

The counterfeit bottles filled with counterfeit liquid were placed into boxes that held approximately 200 bottles each. (Pls. 56.1 ¶ 93.) One of Romero's employees then delivered the boxes to Midwest's warehouse in Otay Mesa, California. (Pls. 56.1 ¶ 93.) The bottles did not contain lot numbers or expiration dates at the time of delivery. (*Id.*) Justin Shayota or one of his laborers signed packing slips to verify the number of bottles and flavors delivered. (*Id.*)[9] In purchase orders or invoices, Romero, Roman, and Midwest's Walid Jamil referred to the contents of the counterfeit 5-hour ENERGY as "michelada," "juice blend," and "spices." (Pls. 56.1 ¶ 95.)

By October 2012, the Romero Defendants and the Midwest Defendants were producing 75,000 bottles of counterfeit 5-hour ENERGY per day. (Pls. 56.1 ¶ 94.) The Romero Defendants

---

[9] In response to Pls. 56.1 ¶ 93, the Midwest Defendants assert that "Plaintiffs' exhibit 89 does not demonstrate that 'Justin . . . signed each packing slip.'" (Midwest 56.1 ¶ 93.) Plaintiffs' ¶ 93 states that "Justin Shayota *or one of his laborers* signed each packing slip." (Pls. 56.1 ¶ 93) (emphasis added.) This statement and supporting evidence are uncontradicted. The evidence plaintiffs cite in support of this statement are a series of packing slips signed by Justin Shayota. (*See* Potter Decl. dated 5/11/2015, Ex. 89.) The packing slips establish that Justin Shayota signed at least some of the packing slips for counterfeit 5-hour ENERGY upon delivery from Romero's warehouse.

15

delivered a total of 4,303,724 bottles of counterfeit 5-hour
ENERGY to the Midwest Defendants over five months.  (*Id.*)  The
Midwest Defendants acknowledge that they "received already
filled bottles of 5-Hour Energy, labeled them, and sent them to
Baja and later Dan-Dee" for distribution.  (Midwest Opp. at 3.)
The Midwest Defendants' own records establish that they sold at
least 4,029,264 of the counterfeit bottles: 508,032 to Baja and
3,521,232 to Dan-Dee.  (Pls. 56.1 ¶ 131.)

      **C.    Distribution and Sale of Counterfeit 5-hour ENERGY**

      Dan-Dee admits it was the "largest first-tier
distributor" of counterfeit 5-hour ENERGY.  (Dan-Dee 56.1 ¶ 109;
*see also* Pls. 56.1 ¶ 109.)  According to its own invoices, Dan-
Dee sold millions of counterfeit bottles of 5-hour ENERGY to
second-tier distributors located in California, Florida,
Illinois, Michigan, Pennsylvania, and Texas.  (Pls. 56.1 ¶¶ 132-
45.)  In all, over forty wholesale or retail entities throughout
the United States bought or sold 5-hour ENERGY produced by the
counterfeiting operation.  It is undisputed that among the
downstream sellers of counterfeit 5-hour ENERGY were the
Baseline Defendants, FDI Defendants, Elegant Defendants, Purity,
Valero, and Core-Mark.

**III. Discovery of Counterfeit 5-hour ENERGY**

      In August 2012, salespeople from Paramount Sales – an
independent broker based in San Jose, California – noticed an

irregularity in its sales of 5-hour ENERGY.  (Pls. 56.1 ¶ 207.)[10]

Paramount was concerned because Pitco Foods ("Pitco"), one of

its major 5-hour ENERGY buyers and a former defendant in this

case, had not ordered Berry or Extra Strength Berry 5-hour

ENERGY in several months.  (Pls. 56.1 ¶ 208.)  Two salespeople

associated with Paramount visited Pitco, recorded the lot

numbers on the Berry and Extra Strength Berry product in Pitco's

inventory, and passed that information on to Living Essentials.

(Pls. 56.1 ¶ 210.)  Paramount obtained a box of 5-hour ENERGY

from Pitco and sent it to Living Essentials for inspection.

(Pls. 56.1 ¶ 211.)  As Living Essentials inspected the product,

Paramount determined that many of its other customers in

California had Berry and Extra Strength Berry 5-hour ENERGY with

the same lot numbers as the product in Pitco's inventory.  (Pls.

56.1 ¶ 212.)

        In approximately late September 2012, Living

Essentials determined that the bottles from Pitco's inventory

were counterfeits.  (Pls. 56.1 ¶ 213.)  The counterfeits

appeared nearly identical to authentic 5-hour ENERGY, but Living

Essentials was able to identify the following differences:

---

[10] Plaintiffs cite Joint Appendix Exhibit 44, the November 8, 2013 deposition
of Sean Riffle at page 103, as evidentiary support for this statement.  (JA
44, 11/8/2013 Deposition of Sean Riffle Tr. 103.)  This appears to be a
typographical error, as the statement is actually supported by JA43, the
November 8, 2013 deposition of Kevin Riffle at Tr. 103:16-20.  (JA 43,
11/8/2013 Deposition of Kevin Riffle Tr. 103:16-20.)

- the counterfeit bottles were slightly shorter than
  authentic bottles;

- the caps of many counterfeit bottles lacked a "sprue"
  or "pimple" on top of the caps that is found on
  authentic bottles;

- authentic bottles feature Living Essentials' "Running
  Man" logo on the caps, while the counterfeit bottles
  featured a "fatter" silhouette of a man running;

- authentic 5-hour ENERGY is always the same pale pink
  color, while the liquid inside the counterfeit bottles
  was varied in color;

- the counterfeit product did not taste or smell the
  same as authentic 5-hour ENERGY.

(Pls. 56.1 ¶ 214.)  Further inspection revealed that all of the

counterfeit 5-hour ENERGY had one of nine flavor/lot

number/expiration date combinations.  (Pls. 56.1 ¶ 215.)

Living Essentials, together with retained private

investigators from Kroll Associates ("Kroll"), subsequently

began visiting retailers throughout the United States to attempt

to inspect and quarantine counterfeit 5-hour ENERGY.  (Pls. 56.1

¶¶ 221-22.)  In late October 2012, plaintiffs filed this

lawsuit and the parallel *Pittsburg* Action.  Plaintiffs sought

and obtained seizure orders and restraining orders from both

courts.  (*See, e.g.*, ECF No. 7, Seizure Order dated 10/25/2013.)

Over the ensuing month, Living Essentials seized hundreds of

thousands of bottles of counterfeit 5-hour ENERGY at dozens of

locations throughout the United States.  (Pls. ¶¶ 225-26.)

Kroll employees contemporaneously tracked and logged counterfeit product using chain-of-custody forms that listed the location where the product was obtained, the variety of 5-hour ENERGY, the lot number, expiration date, and quantity of bottles seized.  (Pls. 56.1 ¶ 227.)  The chain-of-custody forms and the seized or recovered bottles of counterfeit 5-Hour ENERGY are located in four secure storage facilities in California and New Jersey.  (Pls. 56.1 ¶ 336.)  In July and August 2014, Kroll employees visited the storage facilities and manually counted the counterfeit bottles stored at each location.  (Pls. 56.1 ¶ 337; Declaration of Teague Ryan dated 10/24/2014 ("Ryan Decl.") ¶¶ 6-17.)  Ultimately, Kroll investigators counted a total of 2,670,997 counterfeit bottles of 5-hour ENERGY seized or recovered over the course of this action.  (Pls. 56.1 ¶ 364; Ryan Decl. ¶¶ 95-96.)

## LEGAL FRAMEWORK

The court will address the legal framework for analyzing plaintiffs' claims (including available remedies), then consider defendants' liability and damages on a case-by-case basis.  The cross-motion for summary judgment filed by individual defendant David Flood will be considered within the analysis of his individual liability to plaintiffs.

## I. Summary Judgment

"Summary judgment is appropriate where there is no genuine dispute as to any material fact and the record as a whole indicates that no rational factfinder could find in favor of the non-moving party." *Graves v. Finch Pruyn & Co.,* 353 F. App'x 558, 560 (2d Cir. 2009) (citing *Rodal v. Anesthesia Grp. of Onondaga, P.C.,* 369 F.3d 113, 118 (2d Cir. 2004)). "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 202 (2d Cir. 2007) (quotation marks omitted). "A fact is material when it might affect the outcome of the suit under governing law." *Id.* (internal quotation marks omitted). Moreover, an issue of fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

"In order to defeat a motion for summary judgment supported by proof of facts that would entitle the movant to judgment as a matter of law, the nonmoving party is required under Rule 56(e) to set forth specific facts showing that there is a genuine issue of material fact to be tried." *Ying Jing Gan*

*v. City of New York,* 996 F.2d 522, 532 (2d Cir. 1993) (citations omitted). "[O]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude entry of summary judgment." *Anderson,* 477 U.S. at 248. The nonmoving party may not, however, "rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible, or upon the mere allegations or denials of the nonmoving party's pleading." *Ying Jing Gan*, 996 F.2d at 532–33 (citations and quotation marks omitted).

The standard is the same when cross motions for summary judgment are made. *See Morales v. Quintel Entm't, Inc.,* 249 F.3d 115, 121 (2d Cir. 2001); *Eschmann v. White Plains Crane Serv., Inc.*, No. 11-CV-5881, 2014 WL 1224247, at *3 (E.D.N.Y. Mar. 24, 2014). The court must examine each party's motion independently, and "in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales*, 249 F.3d at 115 (citation omitted).

## II. Liability

### A. Lanham Act

Plaintiffs allege that defendants violated the Lanham Act by committing trademark infringement pursuant to 15 U.S.C. §

1114(1)(a)-(b) and false designation of origin pursuant to §

1125(a)(1)(A).[11]  (Pls. Mem. at 75.)

## 1. Trademark Infringement

Section 32(a)(1) of the Lanham Act provides, in

relevant part:

> (1)  Any person who shall, without the consent of the
> registrant –
>
> (a) use in commerce any reproduction,
> counterfeit, copy, or colorable imitation of a
> registered mark in connection with the sale,
> offering for sale, distribution, or advertising
> of any goods or services on or in connection with
> which such use is likely to cause confusion, or
> to cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy, or colorably
> imitate a registered mark and apply such
> reproduction, counterfeit, copy, or colorable
> imitation to labels, signs, prints, packages,
> wrappers, receptacles or advertisements intended
> to be used in commerce upon or in connection with
> the sale, offering for sale, distribution, or
> advertising of goods or services on or in
> connection with which such use is likely to cause
> confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant.  15 U.S.C.

§ 1114(1)(a)-(b).

---

[11] Plaintiffs also seek summary judgment on their false advertising claim
pursuant to § 1125(a)(1)(B).  (Pls. Mem. at 75.)  However, as plaintiffs
acknowledge, false advertising is an alternative basis for liability under §
1125(a) that provides no greater remedies than any other section of the
Lanham Act.  (*See* Pls. Reply at 4.)  Because plaintiffs have established
liability for false designation of origin under the first part of the
statute, § 1125(a)(1)(A), *see infra*, the court need not reach the merits of
their false advertising claim because any remedy for that claim would be
cumulative.

To prevail on a trademark infringement claim under the Lanham Act, "the plaintiff must prove: (1) that it owns a valid, protectable trademark; (2) that the defendants used the registrant's trademark in commerce and without consent; and (3) that there was a likelihood of consumer confusion." *Procter & Gamble Co. v. Quality King Distrib., Inc.*, 123 F. Supp. 2d 108, 113 (E.D.N.Y. 2000). Because the Lanham Act is a strict liability statute, a registrant need not prove knowledge or intent in order to establish liability. *Id.*; *see also Sunward Elec., Inc. v. McDonald*, 362 F.3d 17, 25 (2d Cir. 2004); *El Greco Leather Products Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986) (defendants' "claimed lack of knowledge of its supplier's infringement, even if true, provides no defense").

Plaintiffs have proven the first element of infringement, ownership of valid trademarks. It is undisputed that the counterfeits at issue bore reproductions of the five "5-Hour ENERGY Marks" that are registered on the Principal Registry of the U.S. Patent and Trademark Office. (Pls. 56.1 ¶¶ 18-24; Dolmage Decl. ¶ 8.) A certificate of registration establishes that a mark is "valid (i.e., protectable), that the registrant owns the mark, and that the registrant has the exclusive right to use the mark in commerce." *Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc.*, 192 F.3d 337, 345 (2d

Cir. 1999).  When a plaintiff sues for infringement of its registered trademark, the defendant bears the burden to rebut the mark's protectability.  *Id.*  Defendants do not contest the validity and ownership of plaintiff's marks.  Accordingly, the 5-Hour ENERGY Marks are protected under the Lanham Act.

The next inquiry is whether the counterfeit trademarks created a likelihood of consumer confusion.  To determine likelihood of confusion, courts in the Second Circuit ordinarily apply the eight-factor test set forth in *Polaroid Corp. v. Polaroid Elecs. Corp.*, 287 F.2d 492, 495-96 (2d Cir. 1961).[12]  In the counterfeiting context, however, the court need not undertake an exhaustive analysis of the *Polaroid* factors because "counterfeit marks are inherently confusing."  *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse Corp.*, 689 F. Supp. 2d 585, 596-97 (S.D.N.Y. 2010); *Gucci Am., Inc. v. Duty Free Apparel Ltd.*, 286 F. Supp. 2d 284, 287 (S.D.N.Y. 2003) (use of counterfeits likely to cause confusion because "counterfeits, by their very nature cause confusion").  Defendants do not dispute

---

[12] The eight factors to be considered under the *Polaroid* test are: (1) strength of plaintiffs' mark; (2) degree of similarity between the two marks; (3) proximity of the products in the marketplace; (4) likelihood that the plaintiff will enter a market related to that in which the defendant sells its product; (5) evidence of actual confusion; (6) defendant's bad faith; (7) quality of the defendant's product; and (8) sophistication of the relevant consumer group.  *Arrow Fastener Co., Inc. v. Stanley Works*, 59 F.3d 384, 391 (2d Cir. 1995).

that the counterfeit 5-Hour ENERGY at issue created a likelihood of confusion.

Based on the above, plaintiffs have established that (1) the 5-hour ENERGY Marks are valid and entitled to protection under the Lanham Act, and (2) the use of counterfeit 5-hour ENERGY trademarks created a likelihood of confusion.  It is also undisputed that plaintiffs did not consent to use of counterfeit 5-hour ENERGY trademarks on bottles of counterfeit 5-hour ENERGY made from scratch.[13]  Therefore, the sole remaining issue to determine liability for trademark infringement is whether defendants used the 5-Hour ENERGY marks "in commerce."  The Lanham Act provides that a "mark shall be deemed to be in use in commerce . . . on goods when . . . it is placed in any manner on the goods or their containers . . . and . . . the goods are sold or transported in commerce."  15 U.S.C. § 1127.  The sale of

---

[13] At the pleading stage, the Midwest Defendants alleged that Living Essentials fraudulently represented during a 2011 telephone conference "that Midwest was authorized to change the labels on 5 Hour product from Mexico for re-sale in the United States."  (*See* ECF No. 499, Midwest Parties' First Am. Answer, First Am. Third-Party Complaint filed 4/5/13 at 47.)  The court dismissed Midwest's counterclaim for fraudulent misrepresentation (and all other counterclaims brought by Midwest), finding that, *inter alia*, Midwest failed to plausibly establish that it reasonably relied on alleged directives from Living Essentials to re-label and repackage 5-Hour ENERGY for sale in Mexico.  (*See* ECF No. 711, Memorandum and Order at 8.)  Now, in its opposition to plaintiffs' motion for summary judgment, Midwest again asserts that its principal, Walid Jamil, reasonably believed that Living Essentials authorized Midwest to repack and relabel 5-hour ENERGY diverted from Mexico. (*See* ECF No. 878, Midwest Defendants' Opp. to Plaintiffs' Motion for Summary Judgment ("Midwest Opp.") at 2.)  But even Midwest does not contend that Living Essentials authorized Midwest (or any other defendant) to repackage and relabel counterfeit 5-hour ENERGY made *from scratch*, which is the infringing activity at issue here.

counterfeit goods is sufficient use to establish liability. *See El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 396 (2d Cir. 1986) ("Even though [defendant] was involved neither in the manufacture nor the affixing of the [plaintiff's] trademark to the shoes, its sale of the shoes was sufficient 'use' for it to be liable for the results of such infringement."). There is no dispute that plaintiffs have established Defendants' involvement in the transportation and sale of counterfeit 5-hour ENERGY using invoices, deposition testimony, and evidence recovered by Kroll. Liability for trademark infringement is addressed below on a defendant-by-defendant basis.

### 2. False Designation of Origin

False designation of origin claims are governed by Section 43 of the Lanham Act, 15 U.S.C. § 1125(a)(1). Section 43(a)(1) provides, in relevant part:

> Any person who, on or in connection with any goods or services or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact which . . . is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship or approval of his or her goods, services or commercial activities by another person . . .

shall be liable in a civil action. 15 U.S.C. § 1125(a)(1).

Although § 1114 and § 1125 differ in that the latter statute covers both registered and unregistered trademarks, the legal standard to establish liability "is the same" under both sections. *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 454 (S.D.N.Y. 2005); *Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F. Supp. 619, 622 (S.D.N.Y. 1981) ("Under both the infringement section of the Lanham Act, 15 U.S.C § 1114, and the false designation of origin section, 15 U.S.C. § 1125, the same test is applied to determine whether a particular activity violates the Act."); *Microsoft Corp. v. AGA Solutions, Inc.*, 589 F. Supp. 2d 195, 202 (E.D.N.Y. 2008) ("case law applicable to section 32 claims applies to section 43 claims"). Accordingly, the court need not conduct a separate analysis of plaintiffs' false designation of origin claim because "[t]he same facts that establish [defendants] violated section 32 of the Lanham Act establish[] that they violated section 43(a)." *Microsoft Corp.*, 589 F. Supp. 2d at 203.

### 3. Lanham Act Liability of Individual Defendants

Plaintiffs seek summary judgment against seven individuals who are owners and/or principals of certain defendants. In the Second Circuit, it is well-established that "under the Lanham Act, a corporate officer may be held personally liable for trademark infringement and unfair competition if the officer is a moving, active[,] conscious

force [behind the defendant corporation's] infringement."
*KatiRoll Co. v. Kati Junction, Inc.*, 33 F. Supp. 3d 359, 367
(S.D.N.Y. 2014). In determining individual liability under the
Lanham Act, "it is immaterial . . . whether [the individual]
knows that his acts will result in an infringement." *Id.* A
corporate officer is considered a "moving, active, conscious
force" behind a company's infringement when the officer "was
either the sole shareholder and employee, and therefore must
have approved of the infringing act, or a direct participant in
the infringing activity." *Chloe v. Queen Bee of Beverly Hills,
LLC*, No. 06-cv-3140, 2011 WL 3678802, at *4 (S.D.N.Y. Aug. 19,
2011); *see also Katiroll*, 33 F. Supp. 3d at 367 (a showing that
an officer "authorized and approved the acts of unfair
competition which are the basis of [the] . . . corporation's
liability . . . is sufficient participation in the wrongful
acts" to subject the officer to liability).

###### B.   Copyright Act

Plaintiffs allege that the text of the "Caution" label
appearing on authentic bottles of 5-Hour ENERGY is subject to
protection under the Copyright Act, 17 U.S.C. § 101 *et seq.*
They seek summary judgement on their claim that defendants
violated the Copyright Act by reproducing the exact text of
their "Caution" labels on the counterfeit bottles at issue.
(Pls. Mem. 83-84.)

To establish copyright infringement, a plaintiff must prove (1) ownership of a valid copyright, and (2) that the defendant copied constituent elements of the work that are original. *Feist Publ'n, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991). Like trademark infringement, copyright infringement is a strict liability offense, meaning "intent or knowledge is not an element of infringement." *Fitzgerald Publ'g. Co. v. Baylor Publ'g Co.*, 807 F.2d 1110, 1113 (2d Cir. 1986).

It is undisputed that Living Essentials holds copyright registration certificate TX 6-833-514 for the text appearing on the "Caution" labels of 5-hour ENERGY. (Pls. 56.1 ¶ 19.) Such registration is *prima facie* evidence of the first element of copyright infringement (ownership of a valid copyright), although a defendant may rebut that presumption. *See Scholz Design, Inc. v. Sard Custom Homes, LLC*, 691 F.3d 182, 186 (2d Cir. 2012).

The second element of copyright infringement under *Feist* is whether the work was actually copied and whether the copied work was sufficiently original to warrant copyright protection. "Copying" is established by showing "that the defendant had access to the copyrighted work and that there is a substantial similarity of protectable material between the two works." *Faulkner v. Nat'l Geographic Soc'y*, 576 F. Supp. 2d

609, 613 (S.D.N.Y. 2008) (quoting *Eastern America Trio Products, Inc. v. Tang Electronic Corp.,* 97 F. Supp. 2d 395, 415 (S.D.N.Y. 2000)).  Here, defendants do not dispute that the counterfeit bottles at issue included an identical reproduction of the copyrighted "Caution" text that appears on authentic labels. (Pls. 56.1 ¶¶ 61-62; 214-15.)

To be considered sufficiently original for copyright protection, a work must "possess at least some minimal degree of creativity." *Scholz*, 691 F.3d at 187 (internal citation omitted).  In *Feist*, the Supreme Court explained that "the requisite level of creativity is extremely low; even a slight amount will suffice.  The vast majority of works make the grade quite easily, as they possess some creative spark, no matter how crude, humble, or obvious it might be."  499 U.S. at 345.

The only challenge to plaintiff's copyright infringement claim is raised by the Elegant Defendants, who attempt to rebut the presumptive validity of plaintiff's copyright.  (Elegant Opp. at 8-9.)  They rely on the doctrine of merger, a defense that bars a copyright "when there is essentially only one way to express an idea and thus the idea and its expression are inseparable." *MyWebGrocer, LLC v. Hometown Info, Inc.*, 375 F.3d 190, 194 (2d Cir. 2004) (internal citation and quotation omitted).  Where an idea and its expression are inseparable, "protection of the expression would

effectively accord protection to the idea itself" and the idea and expression are said to have "merged." *N.Y. Mercantile Exch., Inc. v. IntercontinentalExchange, Inc.*, 497 F.3d 109, 116-17 (2d. Cir. 2007) (quoting *Kregos v. Associated Press*, 937 F.2d 700, 705 (2d Cir. 1991)).  Because merger is a means to invalidate a registered copyright, defendant bears the burden to establish merger.  *See Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 109 (2d Cir. 2001).

In support of its merger defense, the Elegant Defendants argue that there are so few ways to express the idea conveyed on the 5-hour ENERGY "Caution" label that affording it copyright protection "would ostensibly grant Plaintiffs ownership over the idea of a caution label for caffeinated beverages itself."  (Elegant Opp. 8.)  The "Caution" label states:

> CAUTION: Contains about as much caffeine as a cup of coffee. Limit caffeine products to avoid nervousness, sleeplessness, and occasionally rapid heartbeat. You may experience a Niacin Flush (hot feeling, skin redness) that lasts a few minutes. This is caused by Niacin (Vitamin B3) increasing blood flow near the skin.

In considering a merger defense, a court "begins[s] by identifying the 'idea' that might be merging with its expression." *N.Y. Mercantile*, 497 F.3d at 117.  It should then consider "the range of possible expressions" and whether all possible expressions are so similar that recognizing a copyright

would bar others from expressing the idea. *Id.; see also Mason v. Montgomery Data, Inc.*, 967 F.2d 135, 138 (5th Cir. 1992) (courts "focus on whether the idea is capable of various modes of expression").

Here, the "idea" expressed on the "Caution" label is a warning about the caffeine content in 5-hour ENERGY and potential side effects of consuming caffeine and niacin. Such a warning obviously can be expressed in a variety of different ways. The particular "Caution" text copyrighted by Living Essentials reflects deliberate choices of content, language, and word order to convey its warning. For example, plaintiffs chose to compare the amount of caffeine in 5-hour ENERGY to the amount of caffeine in a cup of coffee. They could just as readily have listed the milligrams of caffeine contained in each bottle. Even plaintiffs' warning regarding potential side effects of niacin (in addition to caffeine) is enough to overcome Elegant's objection that the copyright at issue risks "grant[ing] Plaintiffs ownership over the idea of a caution label for caffeinated beverages." (Elegant Opp. at 8.) The myriad ways plaintiffs could have chosen to communicate their warning demonstrates that the "Caution" label idea and expression have not merged. *See, e.g., Innovation Ventures, LLC v. N2G Distrib.*, 635 F. Supp. 2d 632 (E.D. Mich. 2008) (rejecting merger challenge to 5-Hour ENERGY "Caution" label copyright and

finding "there is not a standard way of expressing the idea"). Accordingly, Elegant's merger defense is inapplicable and presents no bar to judgment on plaintiffs' copyright infringement claim.

### C.   State Law Unfair Competition

Plaintiffs also move for summary judgment on their state law unfair competition claims pursuant to New York law. (Pls. Mem. 84-85.)  Plaintiffs brought unfair competition claims under New York law in the *Ultimate* Action against all remaining defendants (except Dan-Dee), and under California law in the *Pittsburg* Action against Dan-Dee (and against other defendants that also have settled).

The "essence" of a claim for unfair competition under New York law is that the defendant has misappropriated "the labors and expenditures of another" in a manner "likely to cause confusion or to deceive purchasers as to the origin of the goods." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 34-45 (2d Cir. 1995) (internal citations omitted). To establish a claim for common law unfair competition, "the plaintiff must state a Lanham Act claim coupled with a showing of bad faith or intent."  *Katiroll*, 33 F. Supp. 3d at 370; *see also Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997) ("[Plaintiff's] state law claim of unfair competition is not viable without a showing of bad faith.").

The Elegant Defendants argue that the court should deny summary judgment on plaintiffs' unfair competition claim because there is no basis to find that Elegant acted with bad faith. (Elegant Opp. at 7.) They reason that because plaintiffs have not established (or even attempted to establish) that Elegant willfully infringed the 5-Hour ENERGY Marks, plaintiffs cannot satisfy the bad faith element of their unfair competition claim. (*Id.*) Plaintiffs counter that Elegant's knowledge and intent is irrelevant to liability for unfair competition in this case because "a presumption of bad faith attaches to the use of a counterfeit mark." (Pls. Mem. at 85) (quoting *Lorillard Tobacco*, 378 F. Supp. 2d at 456).[14]

Contrary to plaintiffs' assertion, the Second Circuit has indicated that a bad faith presumption only attaches to an unfair competition claim if a defendant was at least aware of its use of counterfeits. *See Lorillard Tobacco*, 378 F. Supp. 2d at 457 (analyzing liability for unfair competition based on whether defendants "were aware that they were selling counterfeit cigarettes); *Centaur Commc'ns, Ltd. v. A/S/M*

---

[14] Plaintiffs further characterize Elegant's opposition to their unfair competition claim as "academic" because plaintiffs are not seeking damages for unfair competition against the Baseline Defendants, FDI Defendants, Elegant, Purity, and Valero (i.e., the defendants who are not alleged to have willfully infringed). (Pls. Reply at 5.) For that reason, they concede that their "state-law unfair-competition claim is cumulative" of their federal trademark infringement claim. (*Id.*) Plaintiffs explain that their state-law unfair competition claims serve as a means to "seek[] additional punitive damages" against defendants they claim willfully infringed the 5-hour ENERGY Marks (i.e., Midwest, Romero, and Core-Mark).

*Commc'ns, Inc.*, 830 F.2d 1217, 1228 (2d Cir. 1987) ("[A]wareness [that a mark is in use] can give rise to an interference of bad faith."); *Philip Morris USA Inc. v. Felizardo*, No. 03-cv-5891, 2004 WL 1375277, at *6 (S.D.N.Y. June 18, 2004) ("the evidence [plaintiff] proffers to demonstrate [defendant's] *intentional* use of the counterfeit marks . . . also serves to establish [defendant's] bad faith under New York common law") (emphasis added).

If use of counterfeits alone were enough to establish liability – regardless of a defendant's intent or knowledge - unfair competition claims under New York common law would be rendered indistinguishable from strict liability Lanham Act claims. Such a narrow standard is plainly at odds with the bad faith component of New York's unfair competition common law. *See, e.g.*, *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980) (noting that "some element of bad faith" is central to the notion of unfair competition claims under New York law). Accordingly, because plaintiffs have not attempted to establish that Elegant willfully or knowingly infringed the 5-hour ENERGY Marks, summary judgment is denied with respect to plaintiffs' unfair competition claim against Elegant. Summary judgment for unfair competition is also denied as to the other four defendants that plaintiff does not attempt to show infringed willfully or knowingly: Baseline Defendants, FDI

Defendants, Purity, and Valero.  Plaintiffs' New York common law unfair competition claims against defendants alleged to have willfully infringed (Romero Defendants, Midwest Defendants, and Core-Mark) are addressed below on a case-by-case basis.

## III. Remedies

### A.  Damages under the Lanham Act

Living Essentials seeks damages under the Lanham Act for defendants' alleged infringement of the 5-hour ENERGY Marks. Prevailing plaintiffs may recover actual damages under the Lanham Act that equal "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).[15]  Alternatively, the Lanham Act permits plaintiffs to elect to recover, at any time before final judgment is rendered, statutory damages instead of actual damages.  15 U.S.C. § 1117(c).

Here, plaintiffs have elected to pursue statutory damages against those defendants they contend infringed willfully (i.e., Romero, Midwest, and Core-Mark) and actual damages against the remaining defendants (i.e., Baseline, Purity, FDI, Elegant, and Valero).  (Pls. Mem. at 100-106.)

---

[15] Actual damages for trademark infringement may be trebled where the violation involved offering for sale or distribution of goods bearing a counterfeit mark where the mark was known to be counterfeit.  15 U.S.C. § 1117(b).

Several defendants contend that plaintiffs are barred as a matter of law from electing to recover statutory damages against some defendants and actual damages against other defendants in the same action. (*See* Baseline Opp. at 12-16; FDI Opp. at 4-7; Purity Opp. at 4-7.) In support of their argument, these defendants primarily rely on cases involving multiple defendants where, unlike here, a plaintiff elected to pursue statutory damages against all defendants in a case. *See, e.g.*, *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 87 (2d Cir. 2012); *Church & Dwight Co. v. Kaloti Enters. Of Mich, L.L.C.*, 697 F. Supp. 2d 287, 291 (E.D.N.Y 2009); *Tu v. TAD Sys. Tech., Inc.*, No. 08-cv-3822, 2009 WL 2905780, at *2 (E.D.N.Y. Sept. 10, 2009); *Johnson & Johnson Consumer Cos., Inc. v. Aini*, 540 F. Supp. 2d 374, 396 (E.D.N.Y. 2008). Defendants also cite Copyright Act cases where courts have noted that a plaintiff may not recover both statutory and actual damages from *one* defendant for the same copyright violation. *See, e.g., Gabbanelli Accordions & Imports., L.L.C. v. Gabbanelli*, 575 F.3d 693, 698 (7th Cir. 2009).

Although it is true that statutory damages may not be awarded against a defendant where actual damages have been awarded for the same violation (and vice-versa), it does not follow that a plaintiff in a multi-defendant infringement case must recover the same type of damages against all defendants.

Indeed, defendants cite no controlling authority for this proposition. Nor does the text of the Lanham Act contain any such restriction. *See* 15 U.S.C. § 1117. Other courts that have considered the circumstances presented here – a plaintiff electing actual damages for infringement against certain defendants and statutory damages against others in the same action – have awarded both types of damages. *See, e.g.*, *Ortiz-Gonzales v. Fonovisa*, 277 F.3d 59, 61-62 (1st Cir. 2002) (affirming district court's award of statutory damages for copyright infringement against one defendant and actual damages against a second defendant); *Axiom Worldwide, Inc. v. HTRD Grp. H.K. Ltd.*, No. 11-cv-1468, 2013 WL 2406260 (M.D. Fla. June 1, 2013) (awarding statutory and actual damages against multiple defendants in a Lanham Act case).

The option to recover statutory damages against some infringers and actual damages against others is logical considering "statutory damages may serve completely different purposes than actual damages." *Nintendo of Am., Inc. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1011 (9th Cir. 1994). Most significantly among these differences, statutory damage awards may serve a "punitive and deterrent" purpose. *See Church & Dwight*, 697 F. Supp. 2d at 291; *see also Philip Morris USA Inc. v. C.H. Rhodes, Inc.*, No. 08-cv-69, 2010 WL 1196124, at *5 (E.D.N.Y. Mar. 26, 2010) (awarding statutory damages and noting

the "great need for deterrence here to discourage large scale counterfeiting").  This contrasts with awards of actual damages, which are ordinarily circumscribed to represent "compensation and not a penalty."  15 U.S.C. § 1117(a).  Considering the different ends actual and statutory damages may serve, and given the absence of authority prohibiting dual election of such damages against different defendants, the court finds that plaintiffs may pursue statutory damages against defendants alleged to have infringed willfully and actual damages against all other defendants.[16]

### 1.  Actual Damages

Plaintiffs seek two categories of actual damages against defendants Baseline, Purity, FDI, Elegant, and Valero: (1) lost profits they allegedly would have earned but for defendants' sales of counterfeit 5-hour ENERGY; and (2) "loss control costs" they incurred to find and remove counterfeit product from the market (i.e., the amounts plaintiffs paid to the Kroll investigators).  (Pls. Mem. at 106-16.)

### a.  Lost Profits

Typically, "[l]ost profits are calculated by estimating revenue lost due to the infringing conduct and subtracting what it would have cost to generate that

---

[16] The Lanham Act provides that a plaintiff ultimately may elect to recover statutory damages instead of actual damages at "any time before final judgment is rendered by the trial court."  15 U.S.C. § 1117(c).

revenue." *GTFM, Inc. v. Solid Clothing, Inc.,* 215 F. Supp. 2d 273, 305 (S.D.N.Y. 2002). Damages calculations for lost profits must be made with "specificity" although "courts may engage in some degree of speculation in the computation of such damages, particularly where the defendant's infringing conduct makes such computation difficult." *The Apollo Theater Found., Inc. v. W. Int'l Syndication*, No. 02-cv-10037, 2005 WL 1041141, at *11 (S.D.N.Y. May 5, 2005) (internal citations omitted); *see also Schonfeld v. Hilliard*, 218 F.3d 164, 172 (2d Cir. 2000) ("Although lost profits need not be proven with mathematical precision, they must be capable of measurement based upon known reliable factors without undue speculation.") (internal citation and quotations omitted).

To establish lost profits, plaintiffs rely on the report and deposition testimony of their damages expert, Dr. Gregory Bell. (*See* Potter Decl. dated 5/11/2015, Ex. C ("Bell Report").) Dr. Bell calculated Living Essentials' profit per authentic bottle of 5-hour ENERGY, which he defined as net sales revenue per bottle minus the costs incurred to make and distribute each bottle. (*Id.* at 11.) Dr. Bell's formula is consistent with this Circuit's accepted methodology for calculating lost profits. *See Victoria Cruises, Inc. v. Changjiang Cruise Overseas Travel Co.*, 630 F. Supp. 2d 255, 262 (E.D.N.Y. 2008) ("Lost profits are calculated by estimating the

revenue lost due to the infringing conduct and subtracting what it would have cost to generate that revenue.").

To calculate profit per bottle, Dr. Bell used the lowest price at which Living Essentials sold a bottle of authentic 5-hour ENERGY in 2012 (Berry: $1.28; Orange: $1.28; Extra Strength Berry: $1.43)[17] and subtracted the incremental costs[18] Living Essentials would have incurred to make and distribute bottles in those varieties (Berry: $0.19; Orange: $0.20; and Extra Strength Berry: $0.21).  (Bell Report at 11-12.)[19]  Dr. Bell also subtracted a 5% broker commission he assumed Living Essentials would have paid for every bottle it would have sold in place of a bottle of counterfeit product. (*Id.* at 12-13.)  Based on these calculations, Dr. Bell concluded that, for purposes of determining plaintiffs' actual damages, Living Essentials' "incremental profit per authentic bottle" in 2012 was $1.03 for Berry, $1.02 for Orange, and $1.15 for Extra Strength Berry.  (*Id.* at Ex. H.)

Several defendants argue that Dr. Bell's profit-per-bottle calculation is inaccurate because he did not include

---

[17] Berry, Orange, and Extra Strength Berry are the three flavors of 5-hour ENERGY that were counterfeited.

[18] Dr. Bell's cost calculation included: manufacturing costs (labor, rent, laboratory expenses, supplies, repair and maintenance, depreciation, and manufacturing expenses) and transportation (i.e., freight) costs.

[19] No defendant contests the accuracy or admissibility of the underlying evidence Dr. Bell used to determine Living Essentials pricing and costs per bottle.

advertising expenses as an incremental cost necessary to generate sales. (*See* Baseline Opp. at 19-21; FDI Opp. at 23-26; Purity Opp. at 22-26.) These defendants rely on the report of Purity's expert, Henry Fuentes, who opined that Living Essentials' advertising costs are a "variable expense" that grow in proportion to quantity of bottles sold. (Baseline Opp. at 6-8; Schurin Decl., Ex. D ("Fuentes Report").) According to Mr. Fuentes, Living Essentials would have had to spend more on advertising in order to sell an additional 1.9 million bottles of 5-hour ENERGY in 2012 (i.e., the number of sales lost to counterfeiting). (Fuentes Report at 14-15; Purity Opp. at 25; Baseline Opp. at 7-8.) Dr. Fuentes concluded that Living Essentials' incremental profit-per-bottle figure should be lower because Dr. Bell failed to deduct advertising costs that Living Essentials would have incurred to make the sales it lost. (Fuentes Report at Ex. 5; Baseline Opp. at 8.)

Plaintiffs counter that Dr. Bell properly excluded advertising costs because they are not a cost that was "avoided" due to the lost sales. (Pls. Reply at 52-54.) They argue that given 5-hour ENERGY's dominant position in the energy shot market, demand already existed to make all of the sales lost to defendants' counterfeiting, and no additional advertising was necessary. (*Id.*)

As a factual matter, the defendants' dispute over
incremental advertising expenses is neither supported by
evidence nor material. At his deposition, defendants' expert
Mr. Fuentes conceded that he could not conclude that Living
Essentials "save[d] even one penny on advertising because its
product was counterfeited." (JA 63, 7/1/14 Deposition of Henry
Fuentes Tr. 72:3-6.) Defendants also fail to present any
evidence that Living Essentials would have spent more on
advertising absent defendants' wrongful conduct. *Cf. Taylor v.
Meirick*, 712 F.2d 1112, 1121 (7th Cir. 1983) ("Costs that would
be incurred anyway should not be subtracted, because by
definition they [are not] avoided by curtailing the profit-
making activity.").

Although defendants point to a statement made by
Living Essentials' CFO, Matthew Dolmage, that Living Essentials'
advertising budget varies from year-to-year (Baseline Opp. at
20), that statement does not support the defendants' position
that Living Essentials would have spent *more* advertising dollars
to sell the amount of product lost to counterfeiting. This is
especially true considering 5-hour ENERGY had over 90% share of
the energy shot market in 2012. *Cf. Nat'l Presto Indus., Inc.
v. Black & Decker, Inc.*, No. 89-cv-8978, 1992 WL 125559, at *5
(N.D. Ill. May 27, 1992) (rejecting defendants' argument to
include advertising as an incremental cost in lost profit

calculation and noting that given "evidence that [plaintiff's product] already had reached 90% saturation . . . there would have been little added impact from increasing their advertising"). Based on the foregoing, the undisputed evidence presented by plaintiffs establishes for purposes of this action that plaintiffs' profit per authentic bottle of 5-hour ENERGY in 2012 was $1.03 for Berry, $1.02 for Orange, and $1.15 for Extra Strength Berry.

To calculate Living Essentials' lost profits, it is also necessary to determine the number of sales lost due to infringement. "[T]he burden is on the plaintiff to demonstrate that it would have made the sales but for the infringing activity." *Odegard, Inc. v. Costikyan Classic Carpets*, 963 F. Supp. 1328, 1340 (S.D.N.Y. 1997). However, "a plaintiff need not present absolute proof that purchasers of the infringing product would have bought [plaintiff's] product instead. Rather, plaintiff's burden of proof is one of reasonable probability." *Etna Products Co., Inc. v. Q Mktg. Grp., Ltd.*, No. 03-cv-3805, 2004 WL 1769794, at *12 (S.D.N.Y. Aug. 6, 2004) (internal citation omitted). "The methodology of assessing and computing damages is committed to the sound discretion of the district court." *King Instruments Corp. v. Perego,* 65 F.3d 941, 952 (Fed. Cir. 1995).

Given the evidence of Living Essentials' uniquely dominant share of the energy-shot market in 2012,[20] and in the absence of any contrary evidence produced by defendants, there is more than a "reasonable probability" that consumers who purchased counterfeit bottles of 5-hour ENERGY intended to purchase authentic 5-hour ENERGY. *Cf. Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206 (1942) (holding that "if . . . some purchasers bought goods bearing the infringing mark because of the defendant's . . . reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher"); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, No. 04-cv-4146, 2007 WL 328696, at *13 (N.D. Cal. Feb. 2, 2007) (in the absence of evidence submitted by defendants, "it is reasonable to infer, and the Court does infer, that sales of the 13,630 cartons represent lost sales to [plaintiff]").  Two additional factors in addition to the undisputed evidence support this finding.  First, it is not disputed that both retailers and wholesalers co-mingled counterfeit 5-hour ENERGY product with authentic product.  (*See* Bell Report at 8-9.)  Second, there is no evidence (and no defendant argues) that the price of counterfeit bottles was

---

[20] After 5-hour ENERGY, the next closest product represented only 3% of energy shot sales, with the remaining 7% of sales divided among more than 60 different products.  (Pls. 56.1 ¶ 29.)

lower at the retail level or that customers distinguished between counterfeit and authentic bottles based on price. (*Id.*) Accordingly, there is no genuine factual dispute that sales of counterfeit 5-hour ENERGY to end-use consumers represented lost sales of authentic 5-hour ENERGY. *Cf. Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 111 (2d Cir. 2010) (affirming summary judgment where party opposing summary judgment failed to meet its burden to come forward with admissible evidence to rebut moving parties' evidence and thus concluding that no material issue of fact existed).

Plaintiffs' actual damages for lost profits therefore may be determined by multiplying Living Essentials' per-bottle profit amounts by the number of counterfeit bottles of each flavor sold that ended up in the hands of a consumer. The second half of this equation requires evidence, for each "actual damages" defendant, of the amount of counterfeit product purchased by end-user consumers. On the current record, however, there is insufficient evidence to award damages for lost profits because there are fact disputes regarding the number of counterfeit bottles sold by Baseline, Elegant, FDI, Purity, and Valero that were ultimately purchased by end-use consumers.

Finally, the court notes there is no dispute that individual counterfeit bottles were purchased and sold by

multiple defendants in this action.  Several defendants raise concerns that plaintiffs will reap a "double recovery" if they are permitted to recover lost profits from each defendant along a particular distribution chain.  (*See, e.g.*, Core-Mark/Valero Opp. at 20-21; Purity Opp. at 26-27.)  To avoid double recovery, plaintiffs may recover "incremental lost profit" only once for each counterfeit bottle that was sold to an end user.  (Pls. Mem. at 73.)  To the extent that plaintiffs recover lost-profit damages for a particular bottle from one defendant in a particular chain of distribution, the liability of any other defendant in that distribution chain is reduced accordingly.

### b. Kroll "loss control" costs

In addition to lost profits, plaintiffs seek to recover fees they paid Kroll to investigate and seize counterfeit 5-hour ENERGY.  (Pls. Mem. at 111-15.)  Plaintiffs characterize these fees as "loss-control costs" and contend they may be recovered as actual damages under 15 U.S.C. § 1117(a).  Several defendants argue that plaintiffs' "loss-control costs" do not qualify as actual damages and are only recoverable as part of an award of attorneys' fees.  (Baseline Opp. at 23-24; Elegant Opp. 17-21.)

In support of their argument that Kroll fees are recoverable as actual damages, plaintiffs rely on false advertising cases where courts awarded fees to plaintiffs for

"corrective advertising" necessary to combat defendants' false statements. *See, e.g., Balance Dynamics Corp. v. Schmitt Industries*, 204 F.3d 683 (6th Cir. 2000); *Santana Prods. v. Sylvester & Assocs.*, No. 98-cv-6721, 2006 WL 7077215 (E.D.N.Y. Nov. 13, 2006). For example, in *Balance Dynamics*, plaintiff and defendant were competing manufacturers of products that balance industrial grinders. 204 F.3d at 686. Defendant sent letters to plaintiff's customers suggesting that plaintiff's product used a gas harmful to the environment. *Id.* at 687. The court awarded plaintiff "damage control expenses," in the form of corrective advertising costs, but not private investigator costs. *Id.* at 689-93. Although plaintiffs argue that "there's no reason why damage control costs should be *limited to* after-the-fact advertising," (Pls. Mem. at 61-62) (emphasis in original) they identify no cases expanding "damage control" remedies to the type of actual damages sought here: third-party private investigator fees incurred at the direction of an attorney.

Nonetheless, even if investigator costs are not recoverable as actual damages, numerous courts in the Second Circuit and elsewhere have found that "[r]ecovery of private investigator fees has been permitted in trademark cases as part of an award of attorneys' fees." *Sprint Commc'ns Co. L.P. v. Chong*, No. 13-cv-3846, 2014 WL 6611484, at *9 (S.D.N.Y. July 14,

48

2014) (quoting *Eu Yan Sang Int'l Ltd. v. S & M Enters. (U.S.A.) Enter. Corp.,* 09-cv-4235, 2010 WL 3824129, at *8 (E.D.N.Y. Sept. 8, 2010)); *Fila U.S.A., Inc. v. Run Run Trading Corp.*, No. 95-cv-7144, 1996 WL 271992, at *4 (S.D.N.Y. May 21, 1996); *see also Chanel, Inc. v. Gordashevsky*, 558 F. Supp. 2d 532, 539 (D.N.J. 2008); *accord* GILSON ON TRADEMARKS, § 5.19[4][b][iv] ("A prevailing plaintiff may also recover, as part of an attorneys' fee award, reasonable investigator's fees, as long as the investigator acted under the direction of any attorney.") Courts have also held that the reverse is true: "[p]rivate investigator fees are not recoverable if attorneys' fees are not recoverable." *Eu Yan Sang*, 2010 WL 3824129, at *8; *Mister Softee, Inc. v. Boula Vending Inc.*, No. 10-cv-2390, 2011 WL 705139, at *2 (E.D.N.Y. Feb. 17, 2011) (declining to award investigative fees because attorneys' fees were not awarded), *aff'd*, 484 F. App'x 623, 624 (2d Cir. 2012).

The facts of this case support following the clear weight of authority linking the recoverability of private investigator fees to attorneys' fees. The parties do not dispute that Kroll investigators were retained by and operated at the direction of plaintiffs' counsel. In fact, as the Elegant Defendants observe, plaintiffs' counsel invoked the attorney work product doctrine as a basis to prevent a Kroll investigator, Steven Rucker, from testifying regarding portions

of Kroll's investigation. (*See* JA 36, 10/18/2013 Deposition of
Steven Rucker Tr. 36:7-14 (Counsel for Dan-Dee: "So is it
plaintiffs' position that this witness cannot recount any of
Kroll, Inc.'s understandings – any part of Kroll Inc.'s
understanding of any of the facts relevant to its
investigation?" Counsel for plaintiffs: "Yes, that is
right.").) The court agrees with Elegant that plaintiffs cannot
shield Kroll from discovery by invoking the work product
doctrine yet claim expenses attributable to Kroll are "actual
damages" and not part of attorneys' fees. Accordingly, the
court finds that reasonable Kroll investigative fees are not
recoverable as actual damages but may be awarded as an element
of attorneys' fees.

### 2. Statutory Damages

Statutory damages for the non-willful infringement of
registered trademarks are available from $1,000 to $200,000 per
counterfeit mark per type of good. 15 U.S.C. § 1117(c)(1). In
cases of willful infringement, a plaintiff may recover enhanced
statutory damages of "not more than $2,000,000" per counterfeit
mark per type of good. 15 U.S.C. § 1117(c)(2). Here,
plaintiffs seek enhanced statutory damages against defendants
Midwest, Romero, and Core-Mark for alleged willful infringement
of five 5-hour ENERGY trademarks. If willful infringement is
established, the maximum statutory damage award against each

defendant is $10 million ($2 million maximum statutory award times five infringed 5-hour ENERGY Marks).

To prove willfulness, a plaintiff must show (1) that the defendant was actually aware of the infringing activity, or (2) that the defendant's actions were the result of reckless disregard or willful blindness. *See Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413 F.3d 257, 263 (2d Cir. 2005). "[K]nowledge may be actual or constructive. In other words, it need not be proven directly but may be inferred from the defendant's conduct." *N.A.S. Import, Corp. v. Chenson Enter., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992) (internal citation omitted). "Reckless disregard for the possibility of infringement may be found when the infringer should have known - for instance, by virtue of his occupation - that the particular acts would constitute infringement." *U.S. Media Corp., Inc. v. Edde Entm't, Inc.*, No. 94-cv-4849, 1996 WL 520901, at *7 (S.D.N.Y. Sept. 12, 1996). In the trademark infringement context, "willful blindness means that a defendant knew it might be selling infringing goods but nevertheless intentionally shielded itself from discovering the truth." *Fendi Adele, S.R.L. v. Ashley Reed Trading, Inc.*, 507 F. App'x 26, 31 (2d Cir. 2013) (internal quotation marks omitted). The court recognizes that "caution must be exercised in granting summary judgment when state of mind is in issue." *Nora Beverages, Inc.*

*v. Perrier Group of America, Inc.*, 269 F.3d 114, 125 (2d Cir. 2001). Nevertheless, "[w]illful blindness can be proven on summary judgment; a finding of actual knowledge is not required." *Fendi Adele*, 507 F. App'x at 31. If the evidence establishes that "no reasonable juror could fail to find other than willful infringement," the court may award enhanced statutory damages for willful infringement at the summary judgment stage. *Microsoft Corp. v. Black Cat Computer Wholesale, Inc.*, 269 F. Supp. 2d 118, 123 (W.D.N.Y. 2002).

Because the Lanham Act does not provide guidelines for courts to use in determining an appropriate statutory damages award, courts in the Second Circuit have relied on the standard for willfulness applied to copyright claims asserted pursuant to the Copyright Act, 17 U.S.C. § 504. *See Tu v. TAD Sys. Tech. Inc.*, No. 08-CV-3822, 2009 WL 2905780, at *5 (E.D.N.Y. Sept. 10, 2009). Under the Copyright Act, courts consider factors including: (1) the expenses saved and the profits reaped; (2) the revenues lost by the plaintiff; (3) the value of the copyright; (4) the deterrent effect on others besides the defendant; (5) whether the defendant's conduct was innocent or willful; (6) whether a defendant has cooperated in providing particular records from which to assess the value of the infringing material produced; and (7) the potential for discouraging the defendant. *See Fitzgerald Publ'g. Co., Inc. v.*

*Baylor Publ'g. Co.*, 807 F.2d 1110, 1116-17 (2d Cir. 1986).

Courts maintain "wide discretion" in determining an award of

statutory damages. *Id.* at 1116.

**B.    Damages under the Copyright Act**

Under the Copyright Act, an infringer may be liable

for either (1) the copyright owner's actual damages and any

additional profits of the infringer, or (2) statutory

damages.  17 U.S.C. § 504(a).  Plaintiffs have elected to

recover statutory damages against defendants for their alleged

infringement of the "Caution" label copyright.  Against a non-

willful infringer, a plaintiff may recover the "sum of not less

than $750 or more than $30,000 as the court considers

just." *Id.* § 504(c)(1).  If the infringement was willful, the

court may increase an award of statutory damages to a maximum of

$150,000 per infringement. *Id.* § 504(c)(2).  Courts consider

the aforementioned factors set forth in *Fitzgerald Publications*

to determine an appropriate award of statutory damages. *See* 807

F.2d at 1116-17.  The court has broad discretion in awarding

statutory damages under the Copyright Act. *Id.* at 1116.

**C.    Punitive Damages under State Law**

Plaintiffs request awards of punitive damages under

state law on their unfair competition claims against the alleged

willful infringers.  (Pls. Mem. at 118-20.)  Under New York law,

a plaintiff may recover punitive damages for unfair competition

where the "defendant's conduct has constituted gross, wanton, or willful fraud or other morally culpable conduct to an extreme degree." *Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 371 (2d Cir. 1988).  Punitive damages for unfair competition may be awarded in addition to statutory damages.  *See Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp. 2d 349, 361 n.8 (E.D.N.Y. 2008).

The court will not impose punitive damages on the defendants found to have infringed willfully because, as discussed further below, enhanced statutory damage awards already allow for a punitive component.  *See Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, No. 08-cv-68, 2010 WL 2133937, at *10 (E.D.N.Y. Mar. 11, 2010) ("Statutory damages awards are intended to be both compensatory and punitive.").  Awarding punitive damages for unfair competition in addition to enhanced statutory damages for trademark infringement – when the same acts form the basis of both claims – would be cumulative.  *See Church & Dwight*, 697 F. Supp. 2d at 293 ("[a]warding punitive damages on the facts here would be cumulative since statutory damages awards under the Lanham Act are already intended to take into account the goals of deterrence and punishment"); *Louis Vuitton Malletier v. Carducci Leather Fashions, Inc.*, 648 F. Supp. 2d 501, 506 (S.D.N.Y. 2009) (declining to award punitive damages in addition to statutory

54

damages because the "substantial sum" of statutory damages included a punitive component). Plaintiffs have not met their burden to show that maximum statutory awards are insufficient to punish and deter the willful infringers in this case.

### D. **Attorneys' Fees**

Plaintiffs seek an award of attorneys' fees against all defendants. Under the Lanham Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). Attorneys' fees may be awarded regardless of whether a prevailing Lanham Act plaintiff elected to recover actual or statutory damages for infringement. *See Louis Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 111 (2d Cir. 2012) (award of attorney's fees "is available under section 1117(a) in 'exceptional' cases even for those plaintiffs who opt to receive statutory damages"). "Whether to award attorney fees, and the amount of any award, are matters that fall within the discretion of the district court." *Goodheart Clothing Co. v. Laura Goodman Enters.*, 962 F.2d 268, 272 (2d Cir. 1992).

In determining whether a case is "exceptional" under the Lanham Act, the court must "weigh considerations such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burdens of litigation as between winner and loser." *Fresh Del Monte Produce Inc. v. Del Monte Foods Co.,*

933 F. Supp. 2d 655, 665 (S.D.N.Y. 2013) (quoting *S.C. Johnson &*
*Son, Inc. v. Carter-Wallace, Inc.,* 781 F.2d 198, 201 (Fed. Cir.
1986)). Cases considered "exceptional" often involve willful
infringement or bad faith by the defendant. *See Louis Vuitton*
*Malletier*, 676 F.3d at 111 (in determining whether a case is
exceptional, "the key is willfulness on the part of the
defendants"); *Beastie Boys v. Monster Energy Co.*, 112 F. Supp.
3d 31, 43 (S.D.N.Y. 2015) ("[a]s courts in this Circuit have
repeatedly held, a defendant's willful infringement supports an
award of attorneys' fees to a prevailing plaintiff") (citing
cases); *Fendi Adele S.R.L. v. Burlington Coat Factory Warehouse*
*Corp.*, 689 F. Supp. 2d 585, 602 n.11 (S.D.N.Y. 2010) (finding
"[a]ttorney's fees are appropriate in this case based on
[defendant's] willful infringement"); *Microsoft Corp. v. Black*
*Cat Computer Wholesale, Inc.*, 269 F. Supp. 2d 118, 124 (W.D.N.Y.
2002) ("[W]illful infringements justify the award of attorneys
fees in addition to statutory damages as requested by
Plaintiff."). Courts have also granted attorneys' fees to
prevailing Lanham Act plaintiffs where the defendant defaulted.
*See Beastie Boys*, 112 F. Supp. 3d at 46; *Lane Crawford LLC v.*
*Kelex Trading (CA) Inc.*, No. 12-cv-9190, 2014 WL 1338065, at *2
(S.D.N.Y. Apr. 3, 2014).

Recently, the Supreme Court considered the meaning of
"exceptional" cases in the context of an identical fee-shifting

provision in the Patent Act.  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749, 1756 (2014) (discussing 35 U.S.C. § 285).  The Court held:

> [A]n "exceptional" case is simply one that stands out from others with respect to the substantive strength of a party's litigating position ... or the unreasonable manner in which the case was litigated.  District courts may determine whether a case is "exceptional" in the case-by-case exercise of their discretion, considering the totality of the circumstances.

*Id.*  The Supreme Court further instructed that courts resolving motions for fees in patent cases should consider the factors used in Copyright Act cases, as set forth in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994).  These factors include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence."  *Octane Fitness*, 134 S. Ct. at 1756 n.6 (quoting *Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 n.19 (1994)).  Accordingly, in deciding whether to award attorneys' fees, "courts should consider whether a given case 'stands out from others' based on those [*Fogerty*] factors, or based on a finding of willfulness or bad faith."  *Beastie Boys*, 112 F. Supp. 3d at 46.

As discussed below, the court finds this case "exceptional" with respect to the defendants that have infringed willfully, and will enter summary judgment as to plaintiffs'

entitlement to reasonable attorneys' fees (including Kroll's investigative fees) against those defendants. The court will order an inquest to determine the amount and apportionment of attorneys' fees owed by defendants found to have willfully infringed.

### E. Costs

The Lanham Act entitles a plaintiff to recover "the costs of the action" for a violation of § 1125(A) of the statute. 15 U.S.C. § 1117(a). Court have interpreted "costs of the action" to mean those expenses enumerated in 28 U.S.C. § 1920. *See, e.g., Mobius Mgmt. Sys., Inc. v. Fourth Dimension Software, Inc.*, 880 F. Supp. 1005, 1026 (S.D.N.Y. 1994) ("Section 35 of the Lanham Act, 15 U.S.C. § 1117, specifically provides for the assessment of costs as part of the damages calculation. Costs of the action, as defined by 28 U.S.C. § 1920, shall therefore be taxed against defendant pursuant to § 35 of the Lanham Act, and Fed. R. Civ. P. 54(d)."). The court does not reach the merits of plaintiffs' claim for costs because any party seeking to recover costs must file a notice of taxation of costs with the Clerk of Court within 30 days of final judgment. *See* Local Rule 54.1. Thereafter, "the Clerk of Court, not the [district] court, must resolve [cost] disputes in the first instance." *Beastie Boys*, 112 F. Supp. 3d at 60 (citing Local Rule 54.1).

### F. Permanent Injunction

Finally, plaintiffs seek to convert the preliminary injunctions previously entered by this court into permanent injunctions. (Pls. Mem. at 125-27.) To obtain a permanent injunction, a plaintiff must demonstrate (1) actual success on the merits and (2) irreparable harm. *Cartier v. Aaron Faber, Inc.*, 512 F. Supp. 2d 165, 171 (S.D.N.Y. 2007). In cases of trademark infringement, "proof of a likelihood of confusion establishes both likelihood of success on the merits and irreparable harm." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 129 (2d Cir. 2004). The Defendants do not oppose conversion of the preliminary injunctions into permanent injunctions.

### DEFENDANT-BY-DEFENDANT ANALYSIS OF LIABILITY AND DAMAGES

### I. Romero Defendants (Advanced Nutraceutical Manufacturing LLC, Nutrition Private Label, Inc., and Juan Romero Gutierrez)

Juan Romero Gutierrez ("Romero") runs Nutrition Private Label, Inc., which was formerly known as Advanced Nutraceutical Manufacturing LLC. (Pls. 56.1 ¶ 81; JA 8, 12/2/2012 Deposition of Leslie Roman Tr. 53:18-56:2.) The Romero Defendants answered the Seventh Amended Complaint but did not respond to plaintiffs' motion for summary judgment. (*See* ECF No. 309, Answer filed 1/8/2013.) The facts enumerated and supported by admissible evidence in plaintiffs' Rule 56.1

statements are thus deemed undisputed and establish liability with respect to the Romero Defendants due to their failure to respond.  *See* Local Rule 56.1; *Giannullo v. City of New York*, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party then fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.")

The Romero Defendants played an essential role in the counterfeiting scheme.  At the outset of the operation, Romero traveled to Mexico and hired one company to supply blank bottles and a second company to supply caps imprinted with plaintiffs' trademarked "Running Man" logo.  (Pls. 56.1 ¶ 83.)  Romero ordered millions of the bottles and caps, which were sent from the manufacturers in Mexico to Romero's warehouse in Chula Vista, California.  (Pls. 56.1 ¶¶ 8, 87, 316.)

The warehouse served as Romero's base of operations to mix counterfeit liquid and bottle it using the counterfeit bottles and caps he imported from Mexico.  To counterfeit the liquid, Romero relied on samples of authentic 5-hour ENERGY and on the list of ingredients printed on authentic 5-hour ENERGY labels.  (Pls. 56.1 ¶ 88.)  He purchased ingredients by the ton and mixed them together in large plastic drums, which he kept in a storage room in his warehouse because he did not want his employees "to find out what I do."  (Pls. 56.1 ¶ 91.)  Romero transferred the counterfeit liquid into bottles via a hose

connected to a bottle-filling machine.  (*Id.*)  The counterfeit
bottles and caps were not washed after they arrived from Mexico,
and Romero's warehouse was not registered with or inspected by
the United States Food & Drug Administration or the California
Department of Health.  (Pls. 56.1 ¶¶ 91-92.)  The counterfeit
bottles filled with counterfeit liquid were delivered to
Midwest's warehouse in Otay Mesa, California for labeling.
(Pls. 56.1 ¶ 93.)  Romero delivered a total of 4,303,724 bottles
of counterfeit 5-hour ENERGY to Midwest.  (Pls. 56.1 ¶ 94.)  On
February 8, 2013, after plaintiffs filed this lawsuit,
investigators from Kroll visited Romero's warehouse and
discovered thousands of counterfeit bottles and caps available
for further production.  (Pls. 56.1 ¶ 318.)  They also found
packing slips for boxes of red and black bottle caps directed to
"Nutrition Private Label Inc." and "Advanced Nutraceutical Mfg.
LLC."  (Pls. 56.1 ¶ 316.)

        The undisputed facts recounted above clearly establish
that the Romero Defendants willfully infringed plaintiffs'
"Running Man" trademark, which was imprinted on the counterfeit
bottle caps Romero delivered to Midwest.  Romero's conduct also
establishes that he was the "moving, active, conscious" force
behind the willful infringement.

        Plaintiffs acknowledge that the Romero Defendants only
directly infringed one of the five 5-hour ENERGY Marks – the

"Running Man" logo.  (Pls. Mem. at 102.)  This is because the
counterfeit product that Romero delivered to Midwest Defendants
was not yet wrapped with the counterfeit label bearing the other
5-hour ENERGY trademarks at issue.  Plaintiffs contend, however,
that the Romero Defendants should be held contributorily liable
for infringing all five 5-hour ENERGY Marks.  (*Id.*)

The Supreme Court discussed the doctrine of
contributory liability for trademark infringement in *Inwood
Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844
(1982).  According to the Court:

> Even if a manufacturer does not directly control
> others in the chain of distribution, it can be
> held responsible for their infringing activities
> under certain circumstances. Thus, if a
> manufacturer or distributor intentionally induces
> another to infringe a trademark, or if it
> continues to supply its product to one whom it
> knows or has reason to know is engaging in
> trademark infringement, the manufacturer or
> distributor is contributorily responsible for
> any harm done as a result of the deceit.

*Id.* at 853-54; *accord* GILSON ON TRADEMARKS, § 5.19[4][c] ("Parties
that intentionally assist counterfeiters are just as liable for
counterfeiting as the direct infringers.").  The Second Circuit
has subsequently held that "*Inwood*'s test for contributory
infringement applies on its face to manufacturers and
distributors of goods."  *Tiffany (NJ) Inc. v. eBay, Inc.*, 600
F.3d 93, 104 (2d Cir. 2010).  As set forth above, Romero
received authentic bottles of 5-hour ENERGY and copied the

bottles, caps, and ingredients in order to approximate authentic product. Thus, Romero both manufactured and distributed counterfeit goods.

It is undisputed that after receiving counterfeit 5-hour ENERGY from Romero, the Midwest Defendants labeled the bottles with labels displaying the other four trademarks at issue. (*See, e.g.*, Pls. 56.1 ¶ 105; Midwest Opp. at 3 ("The Midwest Defendants received already-filled bottles of 5-Hour Energy, labeled them, and sent them to Baja and later Dan-Dee.").) Because the uncontroverted record establishes that Romero "suppl[ied] its product to one whom it knows or has reason to know is engaging in trademark infringement," *Inwood Labs.*, 456 U.S. at 854, the Romero Defendants are contributorily liable, jointly and severally, for infringing all five of the 5-hour ENERGY Marks.

The Romero Defendants ultimately filled and delivered more than four million counterfeit bottles of 5-hour ENERGY. The sheer size and scope of their infringement warrants an award of maximum statutory damages under the Lanham Act. *See Philip Morris USA Inc. v. U.S. Sun Star Trading, Inc.*, No. 08-cv-68 2010 WL 2133937, at *10 (E.D.N.Y. Mar. 11, 2010) ("courts have taken the scope of a counterfeiting operation into account in calculating statutory damages, providing greater awards for enterprises that involve large quantities of fake goods");

*Church & Dwight Co., Inc.*, 697 F. Supp. 2d at 301 (awarding maximum statutory damages against willful infringer in possession of 800,000 counterfeit goods); *Nike, Inc. v. Top Brand Co.*, No. 00-cv-8179, 2006 WL 2946472, at *2 (S.D.N.Y. Feb. 27, 2006) (awarding maximum statutory damages against willful infringers based in part on "the size of the defendants' infringing operations, which led to the production of millions of infringing goods produced").

The value of plaintiffs' trademarks is another consideration in setting statutory damage awards.  The Romero Defendants infringed what plaintiffs' have established are "incredibly valuable" trademarks.  (Pls. Mem. at 102.)  It is undisputed that 5-hour ENERGY has an over 90% share of the energy shot market.  There is a strong need to deter future counterfeiting of plaintiffs' trademarks.  *See Philip Morris USA Inc.*, 2010 WL 2133937 at *11 (noting that courts have awarded maximum statutory damages where trademarks are "highly valuable, the counterfeiting was . . . on a large scale and would have resulted in substantial profit from the infringement, and there is a strong need to deter the defendants and their ilk from future counterfeiting").

A maximum statutory damages award is further justified by Romero's reckless disregard for public health and safety.  He bottled counterfeit liquid using large plastic drums in an

unsanitary, unregulated industrial warehouse. Even though, to date, no adverse effects are known to have been reported from consumption of the counterfeit product, a maximum award is nonetheless warranted to punish and deter such dangerous activity. *See, e.g., Unilever Supply Chain, Inc. v. I & I Wholesale Food Inc.*, No. 10-CV-1077, 2011 WL 1113491, at *3-4 (E.D.N.Y. Feb. 17, 2011) (finding a "large" statutory damage award warranted where defendants "use[d] the counterfeit labels to push expired mayonnaise onto an unsuspecting public" thereby "subjecting consumers who eventually [ate] this product to a completely unknown danger"); *Koon Chun Hing Kee Soy & Sauce Factory, Ltd. v. Eastimpex*, No. 04-cv-4146, 2007 WL 328696, at *13 (N.D. Cal. Feb. 2, 2007) (finding that "although there have been no reports of any ill effects resulting from the consumption of such [counterfeit] goods, a statutory award nonetheless should be of sufficient magnitude to deter future sales of counterfeit food products by others").

Accordingly, with respect to the Romero Defendants, plaintiffs are awarded $10 million in statutory damages for trademark infringement, plus reasonable attorneys' fees (including Kroll investigative fees). The preliminary injunction against the Romero Defendants shall be converted into a permanent injunction.

## II.  Midwest Defendants (Midwest Wholesale Distributors, Inc., Justin Shayota, Walid Jamil, and Raid Jamil)

Plaintiffs contend the Midwest Defendants are "kingpins" of the counterfeiting operation that "spearheaded the manufacturing of counterfeits." (Pls. Mem. at 11.)  Plaintiffs present uncontradicted evidence that the Midwest Defendants' infringement was willful, and seek an award of maximum statutory damages under the Lanham Act on that basis.

### A.  Midwest Wholesale and Justin Shayota

Midwest Wholesale Distributors, Inc. is a wholesale distributor of household products.  (JA 4, 11/28/2012 Deposition of Justin Shayota ("Shayota Dep.") Tr. 21:5-6.)  Justin Shayota is the president and sole owner of Midwest Wholesale.  (*Id.* at 20:15-21:4, 55:2-6.)

The Midwest Defendants concede that they "received already-filled bottles of 5-Hour ENERGY, labeled them, and sent them to Baja and later Dan-Dee." (Midwest Opp. at 3.)  Between December 2011 and October 2012, Midwest ordered more than 7 million counterfeit 5-hour ENERGY bottle sleeves to use for the counterfeiting operation.  (Pls. 56.1 ¶ 76.)  Justin Shayota personally oversaw the labeling, which ran in two nine-hour shifts, with each shift consisting of 20 laborers.  (Pls. 56.1 ¶ 105.)  Midwest Wholesale ultimately sold 4,029,264 counterfeit bottles featuring the 5-hour ENERGY Marks and "Caution" label copyright.  (Pls. 56.1 ¶ 131.)  Accordingly, plaintiffs are

entitled to summary judgment on their trademark infringement and copyright infringement claims against Midwest. Because "the same facts that establish [defendants] violated section 32 of the Lanham Act establish[] that they violated section 43(a)," *Microsoft Corp. v. AGA Solutions, Inc.*, 589 F. Supp. 2d 195, 203 (E.D.N.Y. 2008), plaintiffs are granted summary judgment on their false designation of origin claim. Given the Midwest Defendants' knowing infringement (as discussed below), plaintiffs are also granted summary judgment on their state law unfair competition claim against Midwest.

The undisputed facts also establish that Justin Shayota is individually liable for trademark infringement, false designation of origin, and copyright infringement as a "moving, active, conscious force" behind the operation due to his sole ownership of Midwest Wholesale and direct oversight of the counterfeit relabeling operation. *See Eu Yan Sang Int'l Ltd. v. S & M Enters. (U.S.A.) Enter. Corp.,* No. 09-cv-4235, 2010 WL 3824129, at *2 (E.D.N.Y. Sept. 8, 2010) (courts have found individual liability for infringement "where the defendant admitted to wielding or was proven to wield a great deal of discretionary authority within the corporation, either by virtue of being the sole employee of the corporation or as an officer with substantial decision making power."); *Johnson & Johnson Consumer Cos., Inc. v. Aini,* 540 F. Supp. 2d 374, 397–98

(E.D.N.Y. 2008) (holding that an individual who was the
president and sole shareholder was a moving, active, conscious
force behind defendant's infringement).

There is ample uncontested evidence from which a jury
could find that Midwest Wholesale and Justin Shayota infringed
willfully. Justin signed packing slips that accompanied
deliveries of counterfeit blank bottles from the Romero
Defendants. (Pls. 56.1 ¶ 93.) The packing slips falsely
identified the bottles as containing "Michelada"[21] (Potter Decl.
dated 5/11/2015, Ex. 89), yet Midwest labeled the bottles with
counterfeit 5-hour ENERGY sleeves that Midwest specially ordered
from another defendant in this action, Leslie Roman of One-Stop
Label. (Pls. 56.1 ¶¶ 104-05.) Although Justin Shayota
testified that he was "surprised" to learn that Midwest
Wholesale was not authorized to package and label 5-hour ENERGY
(Shayota Dep. Tr. 143:6-10), his direct participation and
efforts to disguise the operation demonstrate knowing, willful
infringement. *See, e.g.*, *Philip Morris USA Inc. v. U.S. Sun
Star Trading, Inc.*, No. 08-cv-68 2010 WL 2133937, at *10
(E.D.N.Y. Mar. 11, 2010) ("Further proof of willfulness is the
defendants' attempt to evade scrutiny at the time they imported
the cigarettes through the use of false information in the bill

---

[21] Michelada is "[a] drink made with beer, lime juice, piquant seasonings."
*See* Oxford English Dictionary, *michelada* (2013), *available at*
http://www.oed.com/view/Entry/389663?redirectedFrom=michelada#eid.

of lading – describing the shipment's contents as frozen food products and providing a false destination for delivery.").

Midwest's argument that Justin did not infringe willfully because he simply "took orders from [Walid Jamil]" (Midwest Opp. at 6-7) is unavailing. Justin testified that no one, including Walid Jamil, ever told him that Living Essentials authorized the relabeling. (Shayota Dep. Tr. 143:6-143:14.) Moreover, the record reflects a complete absence of any effort by Justin to determine if the relabeling was authorized. *See Bambu Sales, Inc. v. Ozak Trading Inc.*, 58 F.3d 849, 854 (2d Cir. 1995) (affirming finding of willfulness where, *inter alia,* defendant took no steps to verify authenticity of infringing product, never asked distributor if its distribution was authorized, and never asked where distributor obtained the product). Consequently, based on the record, the court finds that Midwest and Justin Shayota infringed willfully.

### B. Walid Jamil

Midwest does not deny that Walid "Wally" Jamil, a principal of Midwest and Justin's uncle, played an active role in the counterfeiting scheme. Walid testified that he would meet "every week" with Joseph Shayota of defendant Baja Exporting, LLC to discuss production levels and costs of the operation. (JA 3, 11/27/2012 Deposition of Walid Jamil ("Walid Jamil Dep.") Tr. 37:6-13.) He also placed orders for blank

bottles of counterfeit 5-hour ENERGY that Midwest eventually labeled with counterfeit sleeves and sold.  (*Id.* at 51:5-7.)  As profits from the scheme began to roll in, Walid and Joseph Shayota discussed how to split the profits among Midwest, Baja, and Dan-Dee.  (*Id.* at 38:16-23.)  Walid was therefore a "moving, active, conscious force" in the scheme and may be held jointly and severally liable with Midwest Wholesale and Justin Shayota for trademark infringement, false designation of origin, and copyright infringement.  *See, e.g., Bambu Sales, Inc. v. Sultana Crackers, Inc.,* 683 F. Supp. 899, 914 (E.D.N.Y. 1988) (defendant who made purchasing decisions was a moving, active, conscious force behind the corporation's trademark infringement); *Cartier, A Div. of Richemont N. Am., Inc. v. Samo's Sons, Inc.,* No. 04-cv-2268, 2005 WL 2560382, at *10 (S.D.N.Y., Oct. 11, 2005) (same).

Despite Walid's admitted involvement, Midwest contends Walid did not know the product was counterfeit and believed that Living Essentials authorized the relabeling operation.  (Midwest Opp. at 9.)  In support of this argument, Walid submits a declaration in which he claims that during a telephone conference in 2011, an executive with Living Essentials, Robert McCormack, authorized Joseph Shayota of Baja to hire Midwest Wholesale to relabel "Spanish/Mexican label" 5-Hour ENERGY with English labels for sale in the United States.  (Declaration of

Walid Jamil ("Decl. of Walid Jamil") dated 12/19/2014 ¶¶ 5-9.)
Walid's contention regarding relabeling was already considered
and rejected by the court at the pleading stage:

> McCormack's directive to Joseph Shayota, if made
> as alleged, contains no statement directed to
> Midwest and no authorization for the Midwest
> Parties to engage in the activities it ultimately
> engaged in and which are at issue in the main
> counterfeiting action . . . purchasing a
> commercial printer to print expiration dates at
> Baja's direction, and labeling *blank* bottles (not
> simply re-labeling bottles) received from the
> replacement packer.

(ECF No. 711, Mem. and Order dated 3/28/2014) (emphasis in
original.)

Regarding the activities at issue here – the
creation and labeling of counterfeit 5-hour ENERGY from
scratch – Walid only states that he believed he was working
with an authorized 5-hour ENERGY "broker," Leslie Roman of
defendant One-Stop Label.  (Decl. of Walid Jamil ¶ 15.)
However, even if Leslie Roman had been a 5-hour ENERGY
"broker," (which he was not, of course) that would not have
provided authorization for Walid to counterfeit and label
blank bottles of counterfeit 5-hour ENERGY.

Walid's sworn testimony in a separate civil
action, *Shayota v. Green Health Stores, Inc.*, No. 12-cv-
100571 (Cal. Super. Ct.), establishes his knowledge of, and
participation in, the counterfeiting scheme.  (*See* Potter
Decl., Ex. 16.)  The deposition occurred on November 8,

2012 – exactly one week before Living Essentials conducted a court-ordered seizure of counterfeit product at Midwest Wholesale's warehouse in California. (Pls. 56.1 ¶ 273.) At the deposition, Walid discussed the decision to start making 5-hour ENERGY from scratch. He testified that after Midwest finished relabeling and selling Mexican-label 5-hour ENERGY, he and Joseph Shayota found an individual to make 5-hour ENERGY liquid for them. As Walid explained:

> So then we found a packer that pack the 5-hour and put label on it, and Joe [Shayota] sold it. And I told him, Joe, you're tampering with products, you can't do this, it's against the law.

(*Id.* at 206:12-15.) Walid later testified that to "pack" 5-hour ENERGY meant "make it":

> Q: When you say pack the energy drink, do you mean like make it?
>
> A: Pack – yeah, make it.

(*Id.* at 207:2-4.) Despite Walid's statement to Joe Shayota that making counterfeit 5-hour ENERGY was "tampering with products" and "against the law," Walid nonetheless proceeded to relabel counterfeit 5-hour ENERGY bottles in support of the operation. Walid's knowing participation establishes his willful infringement.

Alternatively, even if the undisputed evidence did not compel the finding Walid knew of the counterfeiting operation, Walid was willfully blind to the scheme to

create, bottle, label, and distribute counterfeit 5-hour ENERGY. At his deposition in *this* action, Walid testified that he never personally confirmed that Leslie Roman was an authorized "broker" of 5-hour ENERGY. (Dep. of Walid Jamil at 81:16-21.) He also admitted that he "was not involved in the conversation" with the unnamed "person at 5-Hour" who allegedly provided authorization to relabel the Spanish language 5-hour ENERGY bottles. (*Id.*) Thus, at a minimum, Walid should have taken steps to verify that Living Essentials had actually authorized his own company, Midwest Wholesale, to label millions of blank bottles with 5-hour ENERGY sleeves. *Cf. Telebrands Corp. v. HM Import USA Corp.*, No. 09-cv-3492, 2012 WL 3930405 at *4 (E.D.N.Y. July 26, 2012) ("lack of knowledge does not negate willfulness, since reckless disregard can support a finding of willfulness"). Construing the record in the light most favorable to Walid Jamil, his failure to conduct any such inquiry constitutes willful blindness to the counterfeiting operation.

### C. Raid Jamil

Raid "Brian" Jamil, a Midwest principal, is Walid Jamil's brother and Justin Shayota's uncle. Plaintiffs contend that Raid was "personally involved in Midwest's efforts" to obtain counterfeit labels, "took primary responsibility for

73

Midwest's financial affairs," and therefore should be held individually liable for Midwest's infringement. (Pls. Mem. at 33; Pls. Reply at 25-26.) The Midwest Defendants argue that Raid should not be held liable because he had limited involvement with the operation and did not know the 5-hour ENERGY was counterfeit. (Midwest Opp. at 7.)

The undisputed evidence supports plaintiffs' position. Raid handled the wire transfers of funds between Midwest and others involved in the counterfeiting operation, (Pls. 56.1 ¶ 102) and regularly coordinated payments of tens of thousands of dollars to and from the Baja Defendants, Leslie Roman, MCR Printing, and others to pay for the counterfeit raw materials. (*Id.*) Along with Walid, Raid placed orders for counterfeit labels from One-Stop Label and for counterfeit display boxes from MCR Printing. (Pls. 56.1 ¶ 104.) Raid also signed Midwest's initial purchase orders for counterfeit labels from One-Stop Label. (Pls. 56.1 ¶ 60.) Raid's financial management and orders of counterfeit goods are sufficient to establish that he was a "moving, active, conscious force" behind the counterfeiting. *See KatiRoll Co.*, 33 F. Supp. 3d at 367 (authorization and approval of counterfeit transaction sufficient to establish individual liability). This is true even though Justin Shayota and Walid Jamil arguably had more significant roles in executing the operation.

These facts also establish that Raid acted with reckless disregard for the authenticity of the goods he ordered, bought, and sold. *See N.A.S. Import, Corp. v. Chenson Enter., Inc.*, 968 F.2d 250, 252 (2d Cir. 1992) (noting that "reckless disregard of the copyright holder's rights (rather than actual knowledge of the infringement) suffices to warrant award of the enhanced damages") (quoting *RCA/Ariola Int'l, Inc. v. Thomas & Grayston Co.*, 845 F.2d 773, 779 (8th Cir. 1988)). At the very least, Raid should have suspected that the 5-hour ENERGY labels he regularly ordered from One-Stop Label – an entity completely unaffiliated with Living Essentials – were counterfeit. *See, e.g.*, *Dolori Fabrics, Inc. v. Limited, Inc.*, 662 F. Supp. 1347, 1354 (S.D.N.Y. 1987) (finding willful infringement under the Copyright Act where "instead of purchasing from [plaintiff], [defendant] gave samples to a rival textile converter, who printed [plaintiff's] design on cheaper cloth and then sold it to [defendant]").

Midwest does not identify any affirmative acts Raid took to verify the authenticity of the infringing product. *See Bambu Sales,* 58 F.3d at 854 (affirming finding of willfulness where defendant took no steps to verify authenticity of infringing product). Instead, Midwest points to conclusory testimony from Justin and Walid that they were unaware of Raid's involvement. (Midwest Opp. at 7.) Even if the court could

properly determine that Justin and Walid's testimony is credible on this point, which it cannot, their testimony is not relevant. It was Raid's responsibility to buy and sell Midwest's counterfeiting materials, a sensitive and essential part of the counterfeiting operation. Even if Justin and Walid were unaware of Raid's role, that still would not overcome the undisputed evidence establishing Raid's direct, sustained involvement in the infringing activity. *See Gucci Am., Inc.,* 286 F. Supp. 2d 284, 289 (S.D.N.Y. 2003) (in opposing summary judgment, "[m]ere speculation or 'metaphysical' possibilities alone do not suffice to counter specific evidence."). Accordingly, the court finds that Raid Jamil infringed willfully and may be held jointly and severally liable with the other Midwest Defendants.

### D. Remedies

The Midwest Defendants knowingly bought, labeled, and sold 4,029,264 counterfeit bottles containing counterfeit 5-hour ENERGY. (Pls. 56.1 ¶ 94.) As with the Romero Defendants, the sheer size and scope of their counterfeiting and the value of plaintiffs' trademarks warrants maximum statutory damages against the Midwest Defendants for each of the five trademarks infringed. Midwest also showed reckless disregard for the public's health and welfare by placing counterfeit 5-hour ENERGY labels on Romero's bottles containing counterfeit liquid. Their labeling operation provided a false imprimatur of safety and

legitimacy to fake 5-hour ENERGY mixed in an unsanitary, unregulated, industrial warehouse.

Additionally, a maximum statutory award is justified by the Midwest Defendants' bad faith attempts to conceal their counterfeiting after it was discovered. *See, e.g.*, *Philip Morris USA Inc. v. ABC Chinese Food, Inc.*, No. 08-cv-4336, 2009 WL 4067997, at *1 (E.D.N.Y. Nov. 18, 2009) (awarding maximum statutory damages and noting that defendants' attempts to hide their counterfeiting "underscores the willful element of their actions"). It is undisputed that upon learning of this lawsuit, the Midwest Defendants shipped all of the counterfeit bottles they had on hand to a storage warehouse in Detroit. (Pls. 56.1 ¶ 275.) They then continued making counterfeit product. (*Id.*) For all of these reasons, plaintiffs are awarded $10 million in statutory damages for trademark infringement, plus plaintiffs' reasonable attorneys' fees (including Kroll investigative fees). The Midwest Defendants are jointly and severally liable. The preliminary injunction shall be converted into a permanent injunction against the Midwest Defendants.

A court may decline to award plaintiffs additional statutory damages for copyright infringement. Although the Second Circuit has cautioned that, "[a] plaintiff seeking compensation for the same injury under different legal theories is of course only entitled to one recovery," *Indu Craft, Inc. v.*

*Bank of Baroda*, 47 F.3d 490, 497 (2d Cir. 1997), the court finds that the injuries suffered by plaintiffs for trademark and copyright infringement are distinct, as contemplated by Congress in enacting two separate statutory schemes, neither of which precludes recovery under both statutes.

Here, the damages sustained from defendants' copyright and trademark infringement are separate even though they arose from the same product. The counterfeit bottles bore plaintiffs' copyrighted "Caution" label and plaintiffs' 5-hour Marks, the infringing use of which, separately or together, caused plaintiffs' damages. Even though plaintiffs' damages arise primarily from the infringement of the 5-hour ENERGY Marks (*see* Pls. Mem. at 117 (acknowledging that "the gravamen of this case is principally Defendants' causation of consumer confusion" caused by trademark infringement)), the Midwest Defendants also violated plaintiffs' copyright by arranging for the printing and affixing of the "Caution" label on the counterfeit bottles. Statutory damages under the Lanham Act and the Copyright Act are therefore appropriate to redress plaintiffs' injury caused by the Midwest Defendants' willful infringement. Plaintiffs request, and are awarded, $75,000 in statutory Copyright Act damages against the Midwest Defendants, jointly and severally.

### III. Core-Mark International, Inc.

Core-Mark, a publicly-traded company headquartered in California, is one of the largest wholesale marketers of grocery and other products to the convenience retail industry. (*See* ECF No. 861-11, Declaration of Chris Hobson ("Hobson Decl.") dated 12/19/2014 ¶¶ 3, 5.) The company operates a network of 26 distribution centers and consolidated warehouses (known as "Divisions") located throughout North America. (Hobson Decl. ¶ 5.) In addition to these Divisions, Core-Mark owns Allied Merchandising Industry ("AMI"), which has two distribution centers, one in California and one in Arkansas. (*Id.*)

Core-Mark is one of Living Essentials' largest customers of authentic 5-hour ENERGY and purchases over $20 million of 5-hour ENERGY each year. (*Id.* ¶ 10; Pls. 56.1 ¶ 178.) In 2012, Core-Mark purchased approximately 93% of its 5-hour ENERGY inventory from Living Essentials, but also purchased product from defendants Baseline and Purity. (Hobson Decl. ¶¶ 10-11; Pls. 56.1 ¶ 183.)

Core-Mark does not dispute that it purchased a total of 1,181,952 bottles of counterfeit 5-hour ENERGY. (Pls. 56.1 ¶ 183.) Of these bottles, 706,488 were recovered[22] before they

---

[22] Living Essentials and Core-Mark dispute whether Living Essentials "intercept[ed]" 706,488 counterfeit bottles or whether Core-Mark "segregated and quarantined" those bottles at its warehouses at its own expense. (*See* Pls. 56.1 ¶ 184; Core-Mark 56.1 ¶ 184.) The dispute over how the bottles

were re-sold by Core-Mark, and thus were not transported or sold (i.e., "used in commerce") by Core-Mark.  (Pls. 56.1 ¶ 184; Core-Mark 56.1 ¶ 184.)  After recovering the counterfeit bottles that were in its inventory, Core-Mark purchased 706,488 authentic bottles of 5-hour ENERGY directly from Living Essentials as replacement inventory.  (Core-Mark ¶ 184.)

The undisputed evidence establishes that Core-Mark is liable for the 475,464 bottles of counterfeit 5-hour ENERGY it did not recover and thus "used in commerce."  The court therefore grants plaintiffs' motion for summary judgment against Core-Mark as to their claims for trademark infringement, false designation of origin, and copyright infringement.

Plaintiffs seek maximum statutory damages against Core-Mark on grounds that Core-Mark willfully infringed the 5-hour ENERGY Marks.  (Pls. Mem. at 98-100.)  Core-Mark is a "unique case" among defendants alleged to have infringed willfully because it "was not one of the kingpins" and "was two steps removed from the kingpins in the chain of distribution." (Pls. Mem. at 67.)  Despite this more limited involvement, plaintiffs allege there are two grounds to find that Core-Mark's infringement was willful.

---

were ultimately recovered is not material for purposes of determining Core-Mark's liability for infringement.

First, plaintiffs allege that Core-Mark recklessly disregarded the possibility of counterfeit product by purchasing over one million bottles of 5-hour ENERGY on the "gray market" from Purity and Baseline at prices below Living Essentials' lowest price. In response, Core-Mark argues that it repeatedly sought and received assurances of authenticity from Purity and Baseline before purchasing 5-hour ENERGY. Core-Mark points to the testimony of Karen Rodriguez-McLellan, a "category buyer" at Core-Mark who purchased what turned out to be counterfeit 5-hour ENERGY from Baseline. Ms. Rodriguez-McLellan testified that she asked Baseline's sales representative if its 5-hour ENERGY was "fresh product with good dating" because she "wanted to make sure who -- you know -- where it was coming from." (JA53, Deposition of Karen Rodriguez-McLellan Tr. 137:13-14, 137:24-138:1.) She explained that her own use of the term "fresh product" meant "straight from the manufacturer." (*Id.* at 137:22-23.) A second Core-Mark buyer sought similar assurances in his dealings with Baseline and Purity. (Dunn Decl., Ex. B.) Core-Mark also submits that its buyers had reason to trust assurances from Baseline and Purity based on Core-Mark's long purchasing history with them. (*See* Declaration of Karen Rodriguez-McLellan dated 12/17/2014 ¶ 10.)

Second, plaintiffs submit evidence that Core-Mark willfully disobeyed this court's temporary restraining order by

continuing to sell counterfeit 5-hour ENERGY after plaintiffs'
counsel notified Core-Mark of potential counterfeiting. (Pls.
Mem. at 99-100.) The conduct underlying plaintiffs' claim of
willful infringement is described below.

On October 29, 2012, counsel for Living Essentials
sent an email to several Core-Mark personnel informing them that
Living Essentials believed Core-Mark had counterfeit 5-hour
ENERGY in its inventory. (Pls. 56.1 ¶ 322; Hobson Decl. ¶ 13.)
The email also informed Core-Mark of a temporary restraining
order issued by this court that (1) "immediately" prohibited
Core-Mark from selling counterfeit 5-Hour ENERGY, and (2)
required Core-Mark to turn over all counterfeit 5-hour ENERGY in
its possession, custody, or control. (*See* Hobson Decl., Ex. C.)
Counsel for Living Essentials followed-up the email with an in-
person visit to Core-Mark's headquarters the same day, October
29, 2012. (Pls. 56.1 ¶ 323.)

At 9:23 a.m. that morning, after receiving the email
from plaintiffs' counsel, the division president of AMI, Michael
Dunn, sent an email to various key groups within Core-Mark,
including purchasing managers, division presidents, and
supervisors, instructing them as follows:

> URGENT ACTION PLEASE
> All Divisions need to check stock on 5 Hour
> ENERGY.
> Please refer to illustration below.

> Authentic product will have a raised pimple in
> the center of the lid.
> Living Essentials is concerned that Core Mark
> obtained counterfeit product and is selling it
> into retail.
> If any counterfeit product is found, remove from
> inventory and report those totals to Tim Gilsen
> here at AMI West.
> Further instructions to follow.

(ECF No. 861-3, Declaration of Michael Dunn ("Dunn Decl.") dated 12/18/2014, Ex. C.)  Approximately one hour later, Mr. Dunn sent a second email to Core-Mark personnel identifying three item numbers that Core-Mark's initial investigation had shown to be counterfeit.  (Dunn Decl., Ex. D.)

Mr. Dunn sent a third email to Core-Mark personnel that afternoon, instructing them to "proceed with our business as normal" and advising them that they may "continue to sell 5 hour until I receive further instruction from San Francisco." (*Id.*, Ex. E.)  A Core-Mark manager replied seeking confirmation of this instruction, asking "[j]ust wanted to be clear on this . . . are we to continue to sell the counterfeit items we already have identified in our inventory?"  (*Id.*)  Mr. Dunn replied, "[y]es, that is what I am being told.  The product is likely genuine and their export stuff. (not confirmed)."  (*Id.*) Thirty minutes after sending that email, Dunn received an email from Core-Mark's Vice President of Marketing, Chris Hobson,

instructing him to "[s]egregate the inventory that does not have the dimple (alleged counterfeit product)." (*Id.*, Ex. F.)

The next day, October 30, 2012, Core-Mark personnel were instructed to stop shipment of all 5-hour ENERGY from Core-Mark warehouses. (Dunn Decl. ¶ 16.) Chris Hobson also sent Division presidents an email listing six differences between authentic and counterfeit 5-hour ENERGY and instructing them to "segregate and isolate this alleged counterfeit inventory." (*Id.*, Ex. E.)

Plaintiffs contend that after receiving notice of counterfeit product from plaintiffs' counsel, Core-Mark knowingly sold counterfeit 5-hour ENERGY. Their argument is based on Mr. Dunn's afternoon emails on October 29, 2012 instructing Core-Mark personnel to "proceed with business as normal" and "continue selling 5-hour," and Mr. Dunn's confirming "yes" in response to the specific question, "are we to continue to sell the counterfeit items we already have identified in our inventory?" (Pls. Reply at 35-36.) Core-Mark counters that Mr. Dunn's email reflected his "confusion" in the immediate aftermath of plaintiffs' notice and his "good faith belief" (albeit mistaken) that Core-Mark's product was genuine. (Core-Mark Opp. 18.) Core-Mark also points out that, after receiving notice from plaintiffs' counsel, Core-Mark personnel began manually inspecting bottles for authenticity and segregated

product that did not have the raised "dimple" indicating authentic product.  (Core-Mark Opp. at 17.)

Based on the record evidence, disputed issues of material fact preclude a finding on summary judgment as to Core-Mark's willfulness.  Although Core-Mark's buyers did not independently verify that they were buying authentic product from Purity and Baseline, they at least sought assurances before making purchases.  And while Purity and Baseline's lower wholesale prices perhaps should have raised suspicions of counterfeiting, Core-Mark's buyers explained that they had reason to trust Purity and Baseline based on their prior dealings.  *Cf. Church & Dwight*, 697 F. Supp. 2d at 303-04 (concluding genuine fact issue precluded finding of willfulness where defendant affirmatively sought the assurances of a "longstanding trusted product supplier" that product was not counterfeit).

Likewise, Michael Dunn's October 29, 2012 email instructing Core-Mark personnel to "continue to sell" 5-hour ENERGY is not sufficient for the court to conclude that Core-Mark acted willfully.  Mr. Dunn's affirmative "yes" in response to the question seeking clarification as to whether Core-Mark was "to continue to sell the counterfeit items we have identified in our inventory," presents evidence of willfulness.  Yet, Mr. Dunn testified that he mistakenly believed Core-Mark's

5-hour ENERGY was authentic and quickly rectified his instructions to Core-Mark personnel after learning otherwise. Although his credibility on this issue is questionable, it is for a jury to consider and determine. The parties also dispute whether Core-Mark actually sold or transported counterfeit product after receiving the court's temporary restraining order. (*See* Pls. 56.1 ¶ 329; Core-Mark ¶ 329.) Resolving these factual issues is necessary to understand Core-Mark's intent. Accordingly, summary judgment is denied as to plaintiffs' motion for enhanced statutory damages against Core-Mark.

## IV. Baseline Defendants

### A. Baseline Distribution, Inc.

Baseline is an Illinois-based wholesale distributor of grocery products. It is undisputed that Baseline purchased a total of 879,120 bottles of counterfeit 5-hour ENERGY from Dan-Dee (Pls. 56.1 ¶ 176) and sold those bottles to Core-Mark. (JA 22, Deposition of John Halligan ("Halligan Dep.") Tr. 146:17-21.) Plaintiffs are therefore granted summary judgment against Baseline on their claims for trademark infringement, false designation of origin, and copyright infringement.

### B. David Flood

Plaintiffs seek to hold Baseline's President and co-owner, David Flood, personally liable for Baseline's infringement. Flood has cross-moved for summary judgment on

plaintiffs' claim, contending that he was not a "moving, active, conscious" force behind Baseline's infringement. (*See* ECF No. 56, David Flood's Motion for Summary Judgment.)

The primary allegation regarding Flood's involvement is that he personally approved wire transfers to Dan-Dee in payment for counterfeit 5-hour ENERGY. Plaintiffs identify an October 9, 2012 email from Baseline employee John Halligan to Flood in which Halligan urges Flood to "wire" funds for "5-hour" that same day. (Potter Decl. dated 5/11/2015, Ex. 227.) Halligan later testified that Flood "was in charge of doing the wire and approving something like this" and that his approval was required for wire transfers. (Halligan Dep. at 113:18-19, 45:2-4.) Flood himself testified that he was "in on" the decision to approve purchases of 5-hour ENERGY from Dan-Dee. (JA 59, Deposition of David Flood ("Flood Dep.") Tr. 91:21-92:10.)

Although this evidence suggests Flood ultimately approved wire payments to Dan-Dee, that evidence alone is not dispositive of the issue of his personal liability. Flood, as president of Baseline, was "in on" the approval process for Dan-Dee purchases, but whether Flood was a "moving, active, conscious" participant in purchasing infringing 5-hour ENERGY from Dan-Dee is disputed. Flood's testimony that he did not consider himself to have "final approval" over wire transfers

(Flood Dep. at 173:18-176:6) and that two other Baseline employees, Greg Nagle and Warren Nagle, "probably" had responsibility for wire transfers in 2012, does not resolve the issue of individual liability. (*Id.* at 175:5-176:4.) There is also no record evidence establishing that Flood actually executed wire transfers to Dan-Dee.

These disputes suffice to raise genuine fact issues as to whether Flood "authorized and approved" Baseline's infringing activity such that he may be held personally liable. David Flood's motion for summary judgment is therefore denied, as is plaintiffs' motion to the extent it seeks a finding that Flood is personally liable for Baseline's infringement.

## V.  **Purity Wholesale Grocers**

Purity "has not contested liability and has only litigated the issue of damages." (Purity Opp. at 16.) There is no dispute that Purity purchased 272,592 bottles of counterfeit 5-hour ENERGY. (Pls. 56.1 ¶ 163.) Nor does Purity dispute that it subsequently sold "most" of these bottles to Core-Mark. (Pls. 56.1 ¶ 164.) Summary judgment motion is therefore granted as to plaintiffs' claims against Purity for trademark infringement, false designation of origin, and copyright infringement.

**VI.  FDI Defendants**

    **A.  Food Distributors International Inc.**

Scott Tilbrook founded FDI, a secondary retailer, in 2004.  (Pls. 56.1 ¶ 146.)  FDI does not take physical custody of the products it sells.  (Pls. 56.1 ¶ 147.)  Tilbrook buys products from other wholesalers, brokers, and manufacturers and sells those products to stores and other wholesalers throughout the United States.  (*Id.*)

It is undisputed that FDI purchased more than 900,000 bottles of counterfeit 5-hour ENERGY from Baja and Dan-Dee. (Pls. 56.1 ¶ 155.)  FDI resold those counterfeits to another defendant in this action, Quality King Distributors.  (Pls. 56.1 ¶ 156.)  Consequently, plaintiffs are granted summary judgment on their claims against FDI for trademark infringement, false designation of origin, and copyright infringement.

    **B.  Scott Tilbrook**

It is undisputed that Tilbrook is the sole owner of FDI and is responsible for all aspects of the business.  (Pls. 56.1 ¶ 146.)  The company has no other employees.  (*Id.*) Tilbrook therefore was the "moving, active, conscious" force behind FDI's trademark infringement and is jointly and severally liable for any damages awarded against FDI.

**VII. Elegant Defendants**

###### A.   Elegant Trading, Inc.

Elegant is a trading company owned and operated by Ahmed Bhimani out of his home in Sugar Land, Texas.  (ECF No. 848-4, Declaration of Ahmed Bhimani ("Bhimani Decl.") dated 12/19/2014 ¶¶ 6-7.)  Elegant purchases products from distributors and manufacturers and resells those products to wholesale or retail customers.  (*Id.* ¶ 9.)

There is no dispute that Elegant purchased 489,888 bottles of counterfeit 5-hour ENERGY from Dan-Dee between June 2012 and August 2012.  (Pls. 56.1 ¶ 195.)  Elegant resold all of those bottles to retailers located in New York and Texas. (Bhimani Decl. ¶¶ 17-22.)  Accordingly, plaintiffs are granted summary judgment on their claims against Elegant for trademark infringement, false designation of origin, and copyright infringement.

###### B.   Ahmed Bhimani

Ahmed Bhimani is the owner and president of Baseline and is responsible for its day-to-day operations.  (Pls. 56.1 ¶ 186.)  Elegant does not dispute that Mr. Bhimani negotiates all purchases and sales, handles the logistics of pick-ups and shipments, and approves all payments.  (*Id.*)  Mr. Bhimani was therefore the "moving, active, conscious" force behind Elegant's

trademark infringement and is jointly and severally liable for
any damages awarded against Elegant.

### C. Affirmative Defense – Failure to Mitigate

The Elegant Defendants raise an affirmative defense of
failure to mitigate damages.  They contend that plaintiffs
discovered the counterfeiting operation but "purposely chose to
keep [Elegant] in the dark" in order to "engage in a prolonged
and elaborate campaign raiding various retailers and
warehouses."  (ECF No. 848, Elegant's Opposition to Plaintiffs'
Motion for Summary Judgment ("Elegant Opp.") at 29.)

As an initial matter, the court notes that a failure
to mitigate defense "is most commonly applied in breach of
contract and tort actions."  *Coach, Inc. v. Kmart Corp.*, 756 F.
Supp. 2d 421, 430 n.5 (S.D.N.Y. 2010).  The Elegant Defendants
fail to identify, and the court has not found, a Lanham Act case
in this circuit where such a defense has been recognized.  *Cf.
Home Design Servs., Inc. v. Trumble*, No. 09-cv-964, 2011 WL
843900, at *3 (D. Colo. Mar. 8, 2011) ("Even if [plaintiff] was
aware of possible infringements of its copyrights . . .
[plaintiff] had no duty to preemptively warn individuals . . .
not to violate copyright law.").  Assuming failure to mitigate
is a relevant defense to plaintiffs' trademark and copyright
infringement claims, it "requires the defendant to establish not
only that the plaintiff unreasonably failed to mitigate, but

that reasonable efforts would have reduced the damages."
*Coastal Power Int'l, Ltd. v. Transcontinental Capital Corp.,* 10
F. Supp. 2d 345, 370 (S.D.N.Y. 1998).

The Elegant Defendants have not met their burden to
show plaintiffs' mitigation efforts were unreasonable.  After
discovering counterfeit 5-hour ENERGY in late September and
early October 2012, plaintiffs, supported by Kroll
investigators, immediately launched a nationwide investigation.
(Pls. 56.1 ¶¶ 213, 220-21.)  By the end of October 2012, over 40
Kroll investigators had visited more than 700 wholesalers and
retail locations in 22 states and the District of Columbia.
(Pls. 56.1 ¶ 222.)  Living Essentials kept this initial
investigation confidential in order to analyze, locate, trace,
and ultimately stop production of counterfeit 5-hour ENERGY
before the infringers could take "evasive measures."  (Pls. Mem.
at 88-89.)

Although the Elegant Defendants understandably would
have preferred that to receive notice from plaintiffs "at the
time they first learned of the alleged counterfeiting" (Elegant
Opp. at 29), Living Essentials' chosen mitigation strategy was
well within the bounds of reason.  Plaintiffs are therefore
granted summary judgment on Elegant's failure to mitigate
defense.

## VIII. Valero Retail Holdings, Inc.

Valero is one of the largest independent retailers of transportation fuels and convenience merchandise in the United States. (ECF No. 861-20, Declaration of Charles Pettibon dated 12/18/2014 ¶ 1.) Between June 2012 and October 2012, Valero purchased all of its 5-hour ENERGY directly from Core-Mark. (*Id.* ¶ 6.) After Valero was alerted to the counterfeiting issue, it quarantined and collected 14,928 counterfeit bottles of 5-hour ENERGY. (*Id.* ¶ 10; Pls. 56.1 ¶ 202.)

Valero does not dispute that it sold or transported counterfeit 5-hour ENERGY. After this action was filed, Valero informed Living Essentials that it had located counterfeit products "at hundreds of Valero stores in 7 states." (Pls. 56.1 ¶ 206.) Accordingly, plaintiffs are granted summary judgment on their claims against Valero for trademark infringement, false designation of origin, and copyright infringement.

## CONCLUSION

For the reasons set forth herein, plaintiffs' motion for summary judgment is granted in part and denied in part. David Flood's cross-motion for summary judgment is denied. Plaintiffs are directed to submit proposed permanent injunctions consistent with this opinion.

**SO ORDERED.**

Dated:    March 31, 2016
          Brooklyn, New York

                              _____/s/_____
                              Kiyo A. Matsumoto
                              United States District Judge